# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1717/1725

_____

JoAnn Buytendorp,                        *
                                         *
      Appellant/Cross-Appellee,    *
                                         *     Appeal from the United States
    v.                               *     District Court for the District of
                                         *     Minnesota.
Extendicare Health Services, Inc.,       *
                                         *
      Appellee/Cross-Appellant.    *

_____

Submitted: November 15, 2006
Filed: August 17, 2007

_____

Before LOKEN, Chief Judge, LAY[1] and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

      JoAnn Buytendorp appeals the district court's[2] grant of summary judgment in favor of her employer, Extendicare Health Services, Inc. ("Extendicare"), in this diversity action under the Minnesota Whistleblower's Act, Minn. Stat. §§ 181.931 to 181.935 ("the Act"). Extendicare cross-appeals the district court's denial of a motion

_____

[1]The Honorable Donald P. Lay assumed permanent disability retirement status on January 3, 2007, and died on April 29, 2007. This opinion is being filed by the remaining judges of the panel pursuant to 8th Cir. R. 47E.

[2]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

requesting permission to amend a scheduling order to permit a motion for sanctions against Buytendorp's counsel.  We affirm.

I.  Background

A.  The Parties and the Allegedly Illegal Practices

Extendicare is a for-profit healthcare company that operates long-term care, skilled nursing, assisted living, and shorter-term rehabilitation facilities in Minnesota and other states.  It is a Delaware corporation with its principal place of business in Wisconsin.  Extendicare receives reimbursement payments from various payor sources, including Medicare, Medicaid, and private sources.  The reimbursement rate Medicare pays to Extendicare is substantially higher than the rates paid to Extendicare by the other sources.

Buytendorp began working for Extendicare upon graduation from college in 1989.  Between 1989 and mid-1996, she completed additional course work, obtained an administrator's license, and held a series of positions of increasing authority at Extendicare.  On July 1, 1996, she became the temporary administrator of an Extendicare facility, Trevilla of New Brighton. In December 1996, Extendicare made Buytendorp the permanent administrator at Trevilla.  She worked in this capacity until 2004, when Extendicare terminated her employment.

Buytendorp alleges that she received no adverse performance reviews and was denied no raises nor opportunities for advancement prior to 2003.  She alleges Extendicare terminated her employment because she complained about, and refused to participate in, practices she believed to be illegal.[3]  The objectionable practices

---

[3]Although Buytendorp also alleges she was denied advancement opportunities in 2003 and 2004, she fails to present evidence sufficient to create a triable question of fact regarding Extendicare's hiring practices and the filling of open positions during

related generally to discrimination in the admission and treatment of patients based on payor source. She alleges Extendicare held rooms open for higher-paying Medicare patients, held Medicare patients longer than necessary, moved non-Medicare patients to less desirable rooms to make desirable rooms available for Medicare patients, and cut staffing to levels that were adverse to the patients' interests, all purportedly in violation of federal law, state law, and Medicare guidelines.

Buytendorp states that there was some emphasis within Extendicare to maximize the admission and retention of Medicare patients dating back to 1996 but that she was neither instructed nor pressured to participate in practices she believed to be illegal until the 2003-04 time frame. According to Buytendorp, the atmosphere changed in late 2002 when Extendicare hired Laurie Bebo as a vice-president for the region that included the Trevilla facility. According to Buytendorp, Bebo aggressively pursued an increase in the number of Medicare patients and aggressively pursued cost-cutting measures. Under Bebo, Buytendorp states that she and other employees noticed a strong emphasis on profitability that they believed impeded the provision of good patient care. Buytendorp describes the work atmosphere under Bebo as one of pressure to increase the number of Medicare patients by whatever means possible. Buytendorp also describes a number of specific policies that she characterizes as designed to maximize the admission and retention of Medicare patients to the detriment of patients covered by other payor sources. Buytendorp alleges that these policies, even if not facially illegal, served as a framework that permitted and concealed payor source discrimination.

Regarding the general atmosphere of pressure, Buytendorp states that Bebo instituted a target Medicare patient quota for each facility, known as a payor mix or

---

the relevant window of time. It is not clear which decisionmakers were responsible for filling positions Buytendorp allegedly desired, nor is it clear that Buytendorp's complaints had been communicated to any such decisionmakers. Accordingly, we do not discuss these allegations further.

Medicare census. Administrators' compensation was linked in part to meeting the quotas for their facilities. Bebo and the area director of clinical reimbursement, Jim Hendricks, held weekly conference calls with facility administrators and nursing directors who failed to meet their quotas. Buytendorp states that Hendricks would belittle and yell at staff who failed to meet a Medicare census.

Regarding specific policies, Buytendorp first identifies a policy she calls the "two-beds" policy. The Trevilla facility had some rooms in a rehabilitation wing that contained only two beds per room and that were more spacious than rooms in a separate long-term care wing that contained three beds per room. The two-bed rooms also had a greater number of amenities such as cable television. Buytendorp describes the three-bed rooms as undesirable and hard to market, with the middle beds of the three-bed rooms being particularly unattractive to potential patients. Buytendorp states that, in 2003, Bebo directed her to keep beds available in the two-bed rooms for Medicare patients, even if it meant turning away Medicaid or private source-payor patients. This policy also required Buytendorp to move non-Medicare patients out of the desirable rooms and into three-bed rooms if a Medicare patient called to be admitted. Buytendorp alleges that this practice of discriminating against patients based on payor source was in violation of Minnesota law.

A second specific policy Buytendorp identifies is the "green light" or "green flag" admissions policy. In theory, this policy was designed to streamline the admissions process and make it easier for facilities to deal with hospitals that released patients to Extendicare. The green flag policy was designed to permit any staff member to automatically admit new patients who had certain, enumerated diagnoses. Buytendorp states that, in practice, the green flag policy favored Medicare patients and changed over time into a policy that prohibited the rejection of Medicare admittees. Buytendorp claims the policy first changed to require a regional nurse's approval before admission could be denied to a prospective Medicare patient, regardless of the facility's ability to handle the patient's needs. Later, even regional

nurses and facility administrators could not approve such denials, and only Bebo could approve the rejection of a Medicare patient.

The third policy Buytendorp identifies is the Healthtrac program. In theory, this was a program for tracking patient progress that was intended to minimize the number of patients who were prematurely released and subsequently forced, following injury or relapse, to return for further or different care. Buytendorp alleges that, in practice, Healthtrac came to be used only with Medicare patients and became one of many tools Extendicare used to improperly and unnecessarily lengthen the stays of high-paying Medicare patients. Buytendorp alleges that she was directed to use the Healthtrac program and to take other measures to convince Medicare patients to extend their stays beyond any medically necessary length. Buytendorp admitted in her deposition, however, that she is not a physician nor is she qualified as a physician to determine what treatment is and is not medically necessary.

## B. The Alleged Whistleblowing

Buytendorp states that Bebo announced the two-beds policy during a conference call "some time in 2003." Buytendorp immediately believed that the policy illegally discriminated against patients based on payor source, but she did not voice her concerns to Bebo out of fear of retaliation. Buytendorp implemented the policy and believed herself to be acting in violation of the law whenever she had open beds and turned away prospective patients from non-Medicare payor sources. Buytendorp claims that within two weeks of Bebo's announcement of the policy, Buytendorp "voiced [her] opinion to [Buytendorp's] direct supervisor, Craig Eddinger and . . . felt that was sufficient." Buytendorp claims that she specifically told Eddinger, "It's illegal to discriminate against payor sources in the State of Minnesota. And that we can't hold beds open for Medicare patients." Buytendorp did not complain directly to Bebo, nor did she ask Eddinger to communicate her concerns to

Bebo. Buytendorp stated that she had hoped Eddinger would pass her complaints along, but that she was reluctant to talk directly to Bebo out of fear of retaliation.

Buytendorp did not follow up with Eddinger on the two-beds policy because the Trevilla facility met its Medicare census or quota and "stayed there for quite some time," and therefore, Buytendorp did not participate in the conference calls with Bebo and Hendricks that were designed to address Medicare census shortfalls. In Buytendorp's deposition, when counsel asked her about reporting the two-bed policy, the following exchange took place:

| Counsel: | Let me ask you, when you say we were at budget, do you mean Trevilla of New Brighton? |
|---|---|
| Buytendorp: | Correct. |
| Counsel: | Those conference calls continued though with other facilities? |
| Buytendorp: | I assume so. I didn't [keep] track of other people's census. |
| Counsel: | And so it didn't concern you that other facilities might be violating the law? |
| Buytendorp: | I was very happy with the way the facility was running and I just kept working hard at my own facility, I didn't think of others. |
| Counsel: | So since your facility was on budget and you weren't on conference call you dropped the issue, is that correct? |
| Buytendorp: | Correct. |

Upon further questioning, Buytendorp stated that she met her medicare census and was not required to go back on conference calls until November 2003, when Trevilla failed to meet its Medicare census. At that time, she continued to implement the two-beds policy in an effort to increase the number of Medicare patients at Trevilla. She described one conference call in particular in which various administrators were asked what they were doing to meet the Medicare census goals at their facilities. During the call, Buytendorp explained how she was moving non-

Medicare patients to the middle beds of the undesirable three-bed rooms and keeping other beds open for Medicare patients. According to Buytendorp, she was praised by supervisors when she explained this practice.

Buytendorp made no further statements to Eddinger about her concerns. She does not know if Eddinger shared her comments with any other persons at Extendicare, and she presented no evidence to suggest that Eddinger shared her concerns with other employees or supervisors. Buytendorp states that Eddinger expressed no dissatisfaction with her performance and gave her "a really good review." Buytendorp did not complain directly to Bebo about the objectionable policy, call the corporate compliance phone line, nor complain to any superiors in writing or via email. Extendicare submitted an affidavit from Eddinger in which Eddinger denies Buytendorp's allegation that she complained to him about the two-beds policy being illegal. Eddinger moved to a different position at Extendicare shortly after Buytendorp made her comments to him and left the company entirely in late 2003.

Also in November 2003, Hendricks came to Trevilla to conduct training on the Healthtrac system. At that time, Buytendorp spoke privately with Hendricks and told him she believed it was illegal to treat Medicare patients differently than other patients and hold patients longer than necessary. Buytendorp stated that Hendricks attended meetings every month for three months, and each time, she privately expressed to him her concern over the illegality of the discriminatory practices and patient retention practices. Throughout this time, Buytendorp continued to implement the objectionable programs at Trevilla. Extendicare submitted an affidavit from Hendricks in which Hendricks denies that Buytendorp complained to him about perceived illegal practices.

In December 2003, Bebo and human resources manager Io Shug met with Buytendorp and Lisa Boje, the manager of nursing at Trevilla, to address issues

related to general census numbers and nursing labor costs. Buytendorp does not allege that this meeting was related to Medicare census numbers or payor source discrimination. Rather, Bebo and Shug discussed Buytendorp's and Boje's failure to adequately control nursing costs at a budgeted level commensurate with the facility's overall census or occupancy. According to Buytendorp, "It was a threatening meeting, it basically said you need to fix this or you'll be terminated." Buytendorp admits that the nursing costs were not adequately under control at Trevilla at the time of this meeting, and she does not suggest that the meeting to address this issue was inappropriate. Buytendorp alleges only that, based on her characterization of past practices at Extendicare, this area of concern would not typically have been grounds for termination.

In January 2004, Buytendorp attended a meeting with Wally Lavonavich, the area comptroller in charge of finances and budgets for Extendicare in Minnesota and Wisconsin. Buytendorp talked to Lavonovich one-on-one and said, "Wally, I believe we are, or it is illegal that we are practicing this admissions policy." She also told him "it was illegal that we're holding patients longer than is medically necessary." According to Buytendorp, Lavonavich responded by laughing and saying, "We're a big company, I'm sure this would have been brought up by now if that was true." Extendicare submitted an affidavit from Lavonavich in which Lavonovich denies that Buytendorp complained to him about any perceived illegal practices.

Buytendorp states that Sue Cullen replaced Eddinger as her immediate supervisor at the end of February 2004. Cullen was from Canada, and Buytendorp claims to have been concerned that this new supervisor might not be familiar with applicable U.S. and Minnesota laws and regulations. During an introductory meeting that took place "probably in the first couple of weeks in March," Buytendorp took the opportunity to tell Cullen that she believed the two-beds policy comprised illegal discrimination based on payor source. Buytendorp also told Cullen that the separate practice of "increasing the length of stay on Medicare patients and keeping them in

the facility when it was not medically necessary was also illegal and breaking the law on federal guidelines for Medicare." Regarding the Healthtrac program and other efforts to keep Medicare patients in-house for as long as possible, Buytendorp admits that she participated in carrying out the policies. Extendicare submitted an affidavit from Cullen in which Cullen denies that Buytendorp ever complained to her about any perceived illegal practices.

During Buytendorp's deposition in this matter, counsel for Extendicare questioned her about her interactions with Cullen and Hendricks and about carrying out the policies at Trevilla that Buytendorp found objectionable. Buytendorp consistently characterized the policies as directives she was instructed to follow. The following exchange took place:

Counsel:       Now, at some point did you stop your facility, stop violating these two laws that you were telling me about?
Buytendorp:    No, we did, we followed the directive.
Counsel:       That's what I'm trying to get at, you followed the directive all the way up to and including the time of your termination?
Buytendorp:    Correct.

On April 12, 2004, during a brainstorming meeting that included Buytendorp, Hendricks, Cullen, and administrators from other facilities, those in attendance were expected to suggest methods by which Extendicare could obtain and retain Medicare patients. Buytendorp alleges that she sat conspicuously mute at the meeting and that she, again, pulled Hendricks aside and voiced her concern to him that it was illegal to extend the stays of Medicare patients. Following the meeting Hendricks expressed dissatisfaction with Buytendorp's performance and met with Cullen behind closed doors. After the closed-door meeting, Cullen met with Buytendorp and "was visibly upset and said she was very disappointed in [Buytendorp]." On April 14, 2004, Cullen placed Buytendorp on a performance improvement plan with one month to

meet stated goals. The performance improvement plan or probation plan listed areas of concern that Buytendorp concedes were legitimate areas of concern where she was underperforming. For example, in relation to the control of labor costs and a failure to meet overall facility census goals, Buytendorp stated in her deposition, "I was not at budget for these areas, correct. . . . Our census was low and I had not adjusted the appropriate nursing hours." Buytendorp identifies other concerns as being unfounded, however, and as relating to the implementation of illegal policies. For example, Buytendorp stated, "The area where it said you had to increase your length of stay and attend the Medicare meetings and be an active part of it, that I felt was being fraudulent and illegal and I wasn't going to do that."

C. The Termination

Buytendorp did not meet the goals set out in the performance improvement plan. Cullen stated in an affidavit that she made the decision to terminate Buytendorp and intended to meet with Buytendorp on May 17 to terminate her employment. That meeting was not scheduled, however, because Cullen learned that Minnesota state investigators were conducting an audit of the Trevilla facility. This audit resulted in the discovery of twenty-nine safety violations of varying levels of severity, and Cullen received an oral report of these violations on Friday, May 21, 2004. Cullen set a meeting for the morning of Saturday, May 22.

Cullen stated in an affidavit that when she arrived on Saturday morning, Buytendorp had already packed personal belongings in a box. Cullen claims to have told Buytendorp that she was being terminated because she failed to meet the goals in the performance improvement plan and because of the number and severity of the safety violations identified by the state. Buytendorp alleges that she had not packed her personal belongings before Cullen arrived, but rather, was getting organized for the meeting with Cullen. Buytendorp alleges that Cullen did not offer reasons for the termination other than stating that Buytendorp was not "administrator material."

Buytendorp does not contest the fact that the state conducted an inspection that revealed safety violations. Instead, Buytendorp alleges that the state authorities were overly aggressive and overly critical and that they broke with past practice by listing certain violations individually whereas past reports had grouped violations together. Buytendorp argues that this resulted in an inflated number of violations in the May 2004 inspection report and an amplification of the appearance of risk to patients.

After her termination, Buytendorp brought this retaliation action in state court and Extendicare removed the case to federal court. Buytendorp alleged that Extendicare denied her opportunities for advancement and ultimately fired her in retaliation for whistleblowing and for refusing to participate in allegedly illegal activity. Extendicare moved for summary judgment on Buytendorp's claim under the Act and on a separate state law claim for negligent supervision. The district court granted summary judgment in favor of Extendicare on both claims. The court found that Minnesota's own courts had interpreted the Act to require an official or formal report of wrongdoing before an employee could enjoy protection under the Act and that Buytendorp's repeated comments to her superiors at Extendicare did not qualify as official or formal reports. The district court noted the availability of a mechanism to make such reports (a corporate compliance hotline) and Buytendorp's failure to utilize that mechanism. The district court also noted that Buytendorp failed to make any written complaints, email any complaints, or make notes regarding the alleged illegalities or complaints. Buytendorp appeals the grant of summary judgment on her whistleblower claim but not her claim for negligent supervision.

In the court below, a dispute arose in which counsel for Extendicare accused counsel for Buytendorp of improperly attempting to influence a witness and making misrepresentations to the court. Counsel for Buytendorp accused counsel for Extendicare of improperly withholding documents that had been requested during discovery. Extendicare eventually moved to amend a scheduling order to permit the

filing of a motion for sanctions against Buytendorp's counsel. A magistrate judge[4] denied the motion and Extendicare appealed to the district court. The district court affirmed the magistrate judge's denial of the motion, and Extendicare appeals to our court.

II.     Discussion

The Act prohibits adverse actions against employees who make good faith reports to their employers about actual or suspected illegal conduct. Minn. Stat. § 181.932(a). The Act also prohibits adverse actions against employees who make good faith reports regarding violations of health care standards that "potentially place[] the public at risk of harm." Minn. Stat. § 181.932(d). Finally, the Act protects employees who refuse to participate in practices when there are objective reasons to believe the practices are illegal. Minn. Stat. § 181.932(c). Buytendorp asserted below and maintains on appeal that she was terminated for making good faith reports and for refusing to participate in illegal practices. She admitted, however, that she implemented the identified practices through the time of her termination. As such, there was no refusal to participate. See Gundacker v. Unisys Corp., 151 F.3d 842, 847-48 (8th Cir. 1998) (upholding a grant of summary judgment under subsection (c) of the Act where an employee failed to prove a refusal to participate). To the extent Buytendorp bases her refusal-to-participate claim on her silence at the April 2004 meeting, we find her arguments to be without merit. Sitting quietly at a planning session while actually implementing objectionable policies does not comprise a refusal to participate. Accordingly, we focus our analysis on her claim under subsections (a) and (d) of the Act.

---

[4]The Honorable Franklin L. Noel, United States Magistrate Judge for the District of Minnesota.

-12-

We analyze Minnesota whisteblower claims using the procedural framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Hitchcock v. Fedex Ground Package Sys., Inc., 442 F.3d 1104, 1106 (8th Cir. 2006) (applying the burden-shifting framework of McDonnell Douglas to claims under Minn. Stat. §181.932). Under McDonnell-Douglas, the initial burden is on the plaintiff to establish a prima facie case. Rothmeier v. Inv. Advisers, Inc., 556 N.W.2d 590, 592 (Minn. App. 1996). A prima facie case consists of (1) conduct by the employee that is protected by the Act, (2) an adverse employment action directed at the employee, and (3) a causal connection between the protected conduct and the adverse action. Id. If the plaintiff establishes a prima facie case, a burden shifts to the employer to articulate a legitimate reason for the adverse action. Id. at 592-93. The ultimate burden of proof then rests with the plaintiff to prove that the proffered reason is merely a pretext and that retaliatory animus motivated the adverse action. Id. at 593.

Protected conduct under subsection (a) of the Act is the making of a "good faith" report. Minn. Stat. § 181.932(a). To be a protected report, a complaint must be formal or presented "in an essentially official manner." Janklow v. Minn. Bd. of Exam'rs for Nursing Home Adm'rs, 536 N.W.2d 20, 23 (Minn. App. 1995) (defining a good faith report as "conduct [that] amounts to relating or presenting concerns in an essentially official manner"). In addition, "to constitute whistle-blowing . . . a report [must be] made for the purpose of exposing an illegality and [must not be] a vehicle, identified after the fact, to support a belated whistle-blowing claim." Obst v. Microtron, Inc., 614 N.W.2d 196, 202 (Minn. 2000). In other words, "[i]n determining whether a report of a violation or suspected violation of the law is made in good faith, we look beyond the content of the report and consider the employee's purpose in making the report." Gee v. Minn. State Colls. and Univs., 700 N.W.2d 548, 555 (Minn. App. 2005). "Whether a plaintiff made a report in 'good faith' is a question of fact. Nevertheless, [the] court may determine as a matter of law that certain conduct does not constitute a 'report.'" Rothmeier v. Inv. Advisers, Inc., 556 N.W.2d 590, 593 (Minn. App. 1996) (internal citations omitted).

-13-

Extendicare argues that application of the formality or "essentially official manner" requirement is a simple matter: because Buytendorp failed to make or memorialize her complaints in writing or present them electronically or through the company's corporate compliance hotline, she cannot meet the formality requirement. We do not agree with Extendicare's assertion that the contours of the formality requirement are this simple and well-defined. Although Minnesota's courts have interpreted the statute as containing a formality requirement, neither the statute nor the caselaw interpreting the statute contains an express requirement that reports be in writing. Similarly we find no Minnesota cases standing for the proposition that an employer may dictate the sole method for communicating complaints about illegal conduct. The rationale for a formality requirement, like the rationale for a good faith requirement, is clear: to prevent after-the-fact claims of retaliation based on a dearth of evidence and unsubstantiated allegations. See Obst, 614 N.W.2d at 202. The contours of the formality requirement, however, remain cloudy.

Assuming that Buytendorp satisfied the formality requirement, it is not clear that her repeated statements were made in a good faith effort to expose an illegality. Arguably, "[h]er reports merely expressed her dissatisfaction with [the employer's] conduct and policy, and there is no evidence in the record to suggest that her purpose in reporting was to expose an illegality." Hitchcock, 442 F.3d at 1106; see Fjelsta v. Zogg Dermatology, 488 F.3d 804, 808-09 (8th Cir. 2007) (affirming a grant of summary judgment under the Act where an employee's claimed report was not made for the purpose of exposing an illegality). Here, Buytendorp readily admits that she refrained from complaining to Bebo out of fear of retaliation. In general, we believe that whistleblowers are employees who make good faith reports in spite of the risk of retaliation, not those who avoid such risk.

Nevertheless, we need not decide this case based on the subtleties of Minnesota's good faith reporting requirement and the difficult question of whether Buytendorp's complaints and subjective motivations qualify her as a whistleblower

-14-

under the Act. Rather, we may assume for the purpose of our analysis that Buytendorp's repeated statements to multiple superiors satisfied both the good faith and formality requirements discussed in Minnesota's cases. Buytendorp's case fails, instead, because Extendicare proffered legitimate reasons for Buytendorp's termination—a failure to control labor costs, maintain facility census, and meet state safety standards—and Buytendorp presented insufficient evidence to create a jury question as to whether these proffered reasons were merely pretexts.

In describing the McDonnell Douglas burden-shifting framework, we have stated:

> [T[he actual evidentiary burden that a plaintiff must meet at the prima facie stage [is] "minimal." Where the evidence used to establish a prima facie case meets this minimal burden but is not strong, that evidence, standing alone, may be insufficient to sustain the plaintiff's case at the final stage of the burden-shifting analysis. Conversely, where the evidence of causation for purposes of establishing a prima facie case is quite strong, it may be sufficient, standing alone, to prove a defendant's liability without resort to further evidence.

Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1043 (8th Cir. 2007) (applying the burden-shifting framework in the context of a statutory disability discrimination claim) (internal citations omitted). Here, Buytendorp's prima facie case is not strong, and she does not challenge the veracity of Extendicare's assertions regarding her census, her prior failure to control labor costs, or her receipt of a poor review from the state. Rather, she alleges these issues were not the true motivation for Extendicare's adverse action. Against this backdrop, Buytendorp may not rely solely upon her prima facie case. Rather, she must present evidence of pretext that is sufficient to create a triable question of fact when "viewed in light of the employer's justification." Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005) ("An employee's attempt to prove pretext requires more substantial evidence than it takes to make a prima facie case because unlike evidence establishing a prima facie case,

-15-

evidence of pretext and retaliation is viewed in light of the employer's justification.")
(quotations and alterations omitted).

Buytendorp primarily argues that temporal proximity between her termination and the April 2004 meeting supports an inference of retaliatory animus. "An inference of a causal connection between a charge of discrimination and [an adverse employment action] can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." Arraleh v. County of Ramsey, 461 F.3d 967, 977 (8th Cir. 2006) (internal citations omitted, alteration in original). Here, two of the stated rationales for the termination were Buytendorp's failures to maintain facility census and control labor costs. These were performance issues that Bebo raised in the December 2003 meeting where Buytendorp admits Bebo threatened termination. Buytendorp has presented no evidence suggesting Bebo was aware of her complaints, and Buytendorp admits that she specifically avoided making complaints to Bebo. Cullen renewed this performance concern with the performance improvement plan in April 2004. Given these undisputed facts, it would not be reasonable to characterize this proffered rationale as a last-minute, negative response to protected conduct. Cf. Turner v. Gonzales, 421 F.3d 688, 697 (8th Cir. 2005) (holding that an inference of pretext was permitted where a decisionmaker generated a negative, unscheduled performance review two months after a favorable, regularly scheduled review and five days after receiving notice of the employee's protected conduct). Further, Cullen met with and terminated Buytendorp the day after Cullen learned of the state inspection which exposed a large number of safety violations. Given these facts, temporal proximity, if anything, lends support to Extendicare's position rather than Buytendorp's.

Buytendorp also argues that because Cullen admits to having made the decision to terminate her prior to the state inspection, and because Extendicare now points to the safety violations as a rationale for her termination, Extendicare is waffling and appears to be offering post hoc, pretextual rationales for her termination. See Kobrin

v. Univ. of Minn., 34 F.3d 698, 703 (8th Cir.1994) ( "Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext."). As further support for this argument, Buytendorp points to her own assertion that Cullen failed to offer any explanation on the morning of the termination, other than saying Buytendorp was not "administrator material." For summary judgment purposes, we must ignore Cullen's contrary assertion that Buytendorp had packed her personal belongings in a box prior to termination and that Cullen explained the proffered reasons to Buytendorp at termination.

We need not ignore undisputed facts, however, nor must we recognize unreasonable inferences. We do not believe reasonable jurors could infer pretext from these alleged inconsistencies. Buytendorp argues neither that the inspection results were a fabrication nor that Extendicare was responsible for the state inspectors' actions. Moreover, Cullen's statement as described by Buytendorp is fully consistent with Extendicare's proffered rationales, albeit less specific. Here, an additional, uncontested, legitimate reason for termination arose between the time that Extendicare made the decision to terminate and the time the Extendicare actually terminated Buytendorp. See Freeman v. Ace Tel. Ass'n, 467 F.3d 695, 698 (8th Cir. 2006). On these facts, reference in subsequent litigation to the additional rationale does not permit an inference of pretext.

Finally, Buytendorp argues that the state's report was infirm and that Extendicare's treatment of other administrators proves that Extendicare singled her out for retaliation. We fail to appreciate how the *state's* election to conduct an aggressive inspection relates to *Extendicare's* motives. Also, as to the treatment of other administrators, there is not sufficient evidence for a jury to conclude any such administrator was so similarly situated that differential treatment could support an inference of retaliatory intent.

Buytendorp may well have presented evidence sufficient to create a question of fact as to whether Extendicare conducted its business in an objectionable manner. That is not the question that matters for the purpose of the present retaliation claims. See Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir.1995) (holding the federal courts do not "sit as super-personnel departments" that provide general oversight and re-examine business decisions). The relevant question is whether a reasonable jury could find that Extendicare's proffered reason for the termination was a mere pretext to mask retaliatory animus. Summary judgment was appropriate because Buytendorp failed to present sufficient evidence to submit this question to a jury.

Regarding Extendicare's cross-appeal, we have carefully reviewed the record and find no abuse of discretion in the district court's ruling on the motion to amend the scheduling order. Miss. River Revival, Inc. v. City of Minneapolis, 319 F.3d 1013, 1018 (8th Cir. 2003) (standard of review).

We affirm the judgment of the district court.

_____