# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1492

_____

Alaa E. Elkharwily, M.D.

*Plaintiff - Appellant*

v.

Mayo Holding Company; Mayo Clinic Health System-Albert Lea; Mayo
Foundation; Mark Ciota, M.D.; John Grzybowski, M.D.; Dieter Heinz, M.D.;
Robert E. Nesse, M.D.; Steve Underdahl; Stephen Waldhoff

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: November 19, 2015
Filed: May 20, 2016
[Published]

_____

Before SMITH, BYE, and BENTON, Circuit Judges.[1]

_____

PER CURIAM.

_____

[1] This opinion is being filed by Judge Smith and Judge Benton pursuant to 8th Cir. Rule 47E.

Alaa E. Elkharwily, M.D., sued Mayo Holding Company, Mayo Clinic Health System-Albert Lea (the Clinic), Mayo Foundation, and Mayo staff[2] (collectively Mayo) for wrongful employment termination and retaliation. The district court[3] granted Mayo's motion to dismiss in part and its later motion for summary judgment, while denying Dr. Elkharwily's motion for reconsideration and motion for additional time for discovery. Dr. Elkharwily appeals. We affirm.

I

Dr. Elkharwily, a medical doctor certified in internal medicine, worked as a hospitalist at the Clinic from September 7, 2010, to December 10, 2010. As a hospitalist, his job duties included providing care for admitted patients and refining the "hand-off" process for patients released to the care of their primary providers after hospitalization ended. Dr. Elkharwily reported directly to Dr. Dieter Heinz, Chair of the Division of Medicine, and indirectly to an administrative team including Dr. Mark Ciota, Dr. John Grzybowski, Steve Underdahl (Hospital Administrator), and Lori Routh (Nurse Executive).

Under Clinic policy, new employees–including Dr. Elkharwily–are on probationary status for 90-days and evaluated in writing before the 90th day. At the end of this period, the evaluators recommend either continued employment, extension of probation, or termination. Dr. Elkharwily also participated in Minnesota's Health Professionals Service Program (HPSP) while employed at the Albert Lea Clinic because he suffers from bipolar disorder. This program required a work-site monitor

---

[2]The named Mayo medical staff are Mark Ciota, M.D.; John Grzybowski, M.D.; Dieter Heinz, M.D.; Robert E. Nesse, M.D.; Steve Underdahl; and Stephen Waldhoff.

[3]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

to supervise Dr. Elkharwily and submit quarterly reports assessing his job performance. His work-site monitor at the Clinic was Dr. Ciota.

The Hospital Administrator evaluated Dr. Elkharwily's job performance for his 90-day review. The Administrator solicited information from hospital administration, nursing staff, physician leadership, and physician colleagues about Dr. Elkharwily's job performance, detailing the staff's concerns in a November evaluation: difficulty organizing and prioritizing his work; unreachable to staff; adversarial, resistant to admitting patients, and unnecessarily generated work for the emergency departments; untrusted by the nursing staff for his instructions or interpretation of events; incorrectly informing nursing staff that his contract limits the number of patients he is required to care for to twelve; and difficulty timely completing documentation. Despite these concerns, the Hospital Administrator and Dr. Elkharwily's direct supervisor extended Dr. Elkharwily's employment probationary period by 90 days. As part of the evaluation, the Hospital Administrator and direct supervisor planned to discuss the evaluation with Dr. Elkharwily shortly after its completion.

Simultaneously, Dr. Ciota prepared Dr. Elkharwily's confidential HPSP report. Dr. Ciota interviewed five nursing supervisors about his job performance. Although the Hospital Administrator did not interview these supervisors, their answers reflected many of the same concerns as the evaluation. Dr. Elkharwily did not answer calls and was difficult to locate, had very poor organizational skills, did not see patients in a timely manner, frequently challenged patients' end-of-life choices, became easily frustrated, did not always provide an accurate interpretation of events, and became difficult to work with when feeling overworked. Dr. Ciota sent the HPSP report Minnesota on December 6, 2010.

Before the Hospital Administrator and direct supervisor could discuss the evaluation results with Dr. Elkharwily, the following events took place. On December 7, Dr. Elkharwily gave an order to a nurse to give a patient intravenous (IV) Tylenol.

-3-

The nurse questioned Dr. Elkharwily because she had never heard of IV Tylenol. Dr. Elkharwily insisted he had given IV Tylenol to a patient two days earlier. The nurse contacted the hospital pharmacist, who verified the formulary did not carry IV Tylenol.

The next day, a nursing supervisor reported the incident to the Nurse Executive, Lori Routh. She and the Hospital Administrator discussed the events with Dr. Elkharwily. Dr. Elkharwily reiterated that he believed IV Tylenol was available at the Albert Lea Clinic formulary because he had administered it to a patient a few days earlier. The Administrator explained that IV Tylenol was not available in the formulary. Dr. Elkharwily immediately changed his story stating, "It would have been the right medication to use had it been available."

In light of the inconsistent responses, the Hospital Administrator and Nurse Executive were concerned about patient safety and Dr. Elkharwily's overall trustworthiness. The Clinic placed Dr. Elkharwily on paid administrative leave pending further investigation. The Hospital Administrator and Nurse Executive interviewed nursing staff to assess Dr. Elkharwily's patient safety. The interviews matched the concerns in his 90-day evaluation and HPSP report, including that he was disorganized, dishonest, difficult to reach while on duty, and difficult with patients.

On December 10, the Hospital Administrator outlined his concerns about Dr. Elkharwily's job performance to Dr. Grzybowski. The Administrator concluded, "Based on the volume and magnitude of concerns about Dr. Elkhawily and his performance as a hospitalist, it appears that a majority of team members have lost confidence in his ability and are very pessimistic about his ability to improve."

Later that day, after consulting with in-house counsel, the Clinic's administrative team recommended Dr. Ciota end Dr. Elkharwily's employment or permit him to resign in lieu of termination. Dr. Ciota agreed. Members of the

administrative team and the Director of Human Resources and Staff Development, informed Dr. Elkharwily of the decision to end his employment. Disagreeing with the decision, he said he would consider resigning. On December 11, Dr. Elkharwily resigned.

Three days later, Dr. Elkharwily sent multiple emails to Dr. Ciota challenging the basis for his termination and filed an administrative appeal. Mayo denied the appeal on July 8, 2011. Dr. Elkharwily filed suit, alleging defamation and violations of the Minnesota Vulnerable Adults Act (MVAA), the Emergency Medical Treatment and Active Labor Act (EMTALA), the Minnesota Whistleblower Act, and the False Claims Act.

The MVAA claim derives from his allegation that on December 7, the Clinic provided substandard care to two patients, endangering their lives. Dr. Elkharwily claims he reported the incidents to Dr. Ciota on December 11 and 13.

The EMTALA claims were based on two events between December 7 and 8, 2010. First, Dr. Elkharwily submits Dr. Grzybowski, who was on call, refused to come in and treat two patients within a reasonable period of time. Second, Dr. Elkharwily refused to transfer an unstabilized patient and argues Mayo terminated his employment in retaliation for his refusal to transfer the patient. Dr. Elkhawily asserts he reported these violations to his supervisors.

The Minnesota Whistleblower Act claim derives from an incident on September 15, 2010, when he thought a treating physician had engaged in "criminal negligence" by failing to admit a patient whom Dr. Elkhawily believed to be having a heart attack.

The False Claims Act claim stems from an email he sent to his supervisors in November, suggesting the Clinic establish an inpatient wound-care team because not having one was "a huge loss of revenue for the hospital." Dr. Elkharwily argues that

-5-

this email reported Mayo was providing unlicensed care and unlawfully billing patients, constituting a complaint of a violation of the False Claims Act.

The defamation claim alleged Mayo made false statements about his job performance during his initial termination meeting and review meeting. Dr. Elkharwily asserts Mayo's statements were incorrect, unsubstantiated, and detrimental to his reputation in the medical community.

Mayo moved to dismiss Dr. Elkharwily's claims. The district court dismissed Dr. Elkharwily's claims for defamation, violations of MVAA, and part of his EMTALA claim about terminating his employment for refusing to transfer a patient.

On the remaining claims, Mayo moved for summary judgment. Opposing summary judgment, Dr. Elkharwily filed a timely but over-length response and attached a 51-page declaration, incorporated by reference. The district court struck Dr. Elkharwily's declaration because his submission was already over the acceptable word limit. The district court also denied Dr. Elkharwily's motion for additional discovery, the subject of multiple prior unsuccessful motions.

The district court granted Mayo's motion for summary judgment, dismissing the remaining claims with prejudice. Dr. Elkharwily appeals.

II

A

Dr. Elkharwily argues the district court erred in granting Mayo's motion to dismiss his claims under the MVAA, for defamation, and under EMTALA.

-6-

"We review *de novo* a district court's dismissal for failure to state a claim, taking all facts alleged in the complaint as true." Cuellar-Aguilar v. Deggeller Attractions, Inc., 812 F.3d 614, 618 (8th Cir. 2015), reh'g denied (Feb. 10, 2010). To avoid dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'" McCaffree Fin. Corp. v. Principal Life Ins. Co., 811 F.3d 998, 1002 (8th Cir. 2016) reh'g and reh'g en banc denied (Feb. 17, 2016) (quoting Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009)). "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

Under the MVAA, if "[a] mandated reporter . . . has reason to believe that a vulnerable adult is being or has been maltreated . . . [he] shall immediately report the information . . . ." Minn. Stat. § 626.557, subdiv. 3(a). This requirement is satisfied either by an oral report to the facility's common entry point or by following the facility's internal reporting procedure. Id. at subdiv. 4, 4a.

Dr. Elkharwily concedes he did not report the violations to a common entry point. And, his conclusory allegations do not show compliance with the internal reporting procedure. Dr. Elkharwily alleged he reported violations under MVAA to the Clinic staff, including Dr. Ciota, Dr. Grzybowski, his direct supervisor, and the Hospital Administrator. However, nowhere does he allege his reporting compliance with the internal reporting procedure. The district court properly dismissed his claim.

B

Dr. Elkharwily alleged Mayo made false statements about his performance during his initial termination meeting and review meeting, which amount to defamation. The district court dismissed because Mayo's statements were protected

by qualified privilege. Dr. Elkharwily argues Mayo did not have reasonable grounds for believing its false statements. We disagree.

Under Minnesota law, a plaintiff must prove three elements to establish a defamation claim: "(1) the defamatory statement is communicated to someone other than the plaintiff, (2) the statement is false, and (3) the statement tends to harm the plaintiff's reputation and to lower the plaintiff in the estimation of the community." Bahr v. Boise Cascade Corp., 766 N.W.2d 910, 919-20 (Minn. 2009) (internal quotation marks omitted (cited in Chambers v. Travelers Cos., Inc., 668 F.3d 559, 564 (8th Cir. 2012)). However, even if the plaintiff proves the three elements, the defendant may be entitled to qualified privilege if the statement was "made upon a proper occasion, from a proper motive, and . . . based upon reasonable or probable cause." Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 256-57 (Minn. 1980). "Communications between an employer's agents made in the course of investigating or punishing employee misconduct are made upon a proper occasion and for a proper purpose, as the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees." McBride v. Sears, Roebuck & Co., 235 N.W.2d 371, 374 (Minn. 1975) (cited in Sherman v. Rinchem Co., 687 F.3d 996, 1008 (8th Cir. 2012)).

Mayo's allegedly defamatory statements are protected by qualified privilege because they were made in the course of evaluating, investigating, or punishing Dr. Elkharwily's performance. Mayo's critiques of his performance were made upon proper occasion and from proper motive as part of two mandatory and independent evaluations–the HPSP report and 90-day review. Mayo's alleged defamatory statements were also based on reasonable cause, the confidential opinions of several colleagues. Likewise, Mayo's allegedly defamatory statements were made during the course of its investigation of the IV Tylenol incident. Mayo's motive and occasion for making the allegedly defamatory statements were proper and the criticisms were based

on reasonable cause. The district court properly dismissed Dr. Elkharwily's defamation claim.

C

Dr. Elkharwily alleged Mayo terminated his employment in retaliation for his refusal to authorize the transfer of an unstabilized patient, in violation of the EMTALA. The district court partially dismissed Dr. Elkharwily's claim because his January 3, 2011, written statement to the Minnesota Board of Medical Practice reporting Mayo's violations directly contradicted his EMTALA allegation in his complaint. Dr. Elkharwily contends that not only did his sworn statement constitute evidence outside of the pleadings, but also he had expert testimony by Dr. Daniel Doornink refuting his sworn statement and raising an issue of fact. Dr. Elkharwily believes that the district court should have converted the motion to dismiss into a motion for summary judgment.

Because Dr. Elkharwily referenced his January 2011 report in his second amended complaint, the district court properly considered his testimony and appropriately decided this issue in the motion to dismiss. Assuming without deciding the district court erred in dismissing this portion of Dr. Elkhawily's claim under Rule 12(b)(6), such an error is harmless because summary judgment was appropriate, as Dr. Doornink's declaration does not trump Elkharwily's written statement contradicting his allegation. Fed. R. Civ. P. 61; see Quinn v. St. Louis Cty., 653 F.3d 745, 750 (8th Cir. 2011) (finding error in dismissing claim under 12(b)(6) was harmless because summary judgment was appropriate on all claims); Gibb v. Scott, 958 F.2d 814, 816-17 (8th Cir. 1992) (noting the district court's failure to convert 12(b)(6) motion to summary judgment motion when considering matters outside pleadings may be harmless when record supports summary judgment). Dr. Elkharwily's signed and notarized statement stated the patient "had been stabilized" before being transferred.

An EMTALA claim does not apply to patients who are stabilized.  42 U.S.C. § 1395dd(b)(1).

D

Dr. Elkharwily initially argued Mayo terminated his employment as retaliation for reporting violations under the Minnesota Whistleblower Act, the EMTALA, and the False Claims Act.  The district court granted summary judgment to Mayo on all three issues.  The court determined Dr. Elkharwily failed to establish pretext for retaliation under the Minnesota Whistleblower Act and EMTALA, or that Mayo's decision to terminate his employment was motivated solely by his reports of False Claims Act violations.  Dr. Elkharwily claims the district court's findings were erroneous because the record does not support its findings.

"We review a district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party and giving the non-moving party the benefit of all reasonable inferences."  United States v. Dico, Inc., 808 F.3d 342, 346 (8th Cir. 2015).  Summary judgment is proper only if the moving party satisfies its burden of demonstrating that no genuine issues of material fact remain for trial.  Fed. R. Civ. P. 56(a).

An employer shall not terminate an employee as retaliation for reporting a violation under the Minnesota Whistleblower Act, EMTALA, or False Claims Act.  See Minn. Stat. § 181.932, subdiv. 1(1) (providing the Minnesota Whistleblowers Act protects an employee from retaliatory discharge if "the employee . . . in good faith, reports a violation, suspected violation, or planned violation of any federal or state law . . . to an employer"); 42 U.S.C. § 1395dd(I) ("A participating hospital may not penalize or take adverse action against a . . . physician because the . . . physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee

-10-

reports a violation of a requirement of this section."); 31 U.S.C. § 3730(h) (stating the False Claims Act whistleblower statute protects employees "discharged . . . because of lawful acts done by the employee" in furtherance of a civil action to stop false claims."). Dr. Elkharwily alleged Mayo engaged in activity that violated the Minnesota Whistleblower Act, EMTALA, and False Claims Act including: refusing to admit a patient whom Dr. Elkharwily believed to be having a heart attack, in violation of the Minnesota Whistleblower Act; an on-call doctor refusing to come in and treat a patient in violation of the EMTALA; and billing patients fraudulently for unlicensed care in violation of the False Claims Act. Dr. Elkharwily argues Mayo terminated his employment in retaliation for reporting these violations.

In the absence of direct evidence of retaliation, courts apply the McDonnell Douglas burden-shifting framework to the Minnesota Whistleblower Act claims. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see Hilt v. St. Jude Med. S.C., Inc., 687 F.3d 375, 378 (8th Cir. 2012) (applying McDonnell Douglas analysis to a Minnesota Whistleblower Act claim). In their briefs, the parties agree the McDonnell Douglas burden-shifting analysis also applies to a retaliation claim under EMTALA. See Ritten v. Lapeer Reg'l Med. Ctr., 611 F. Supp. 2d 696, 716 (E.D. Mich. 2009) (applying McDonnell Douglas analysis to an EMTALA retaliation claim); Lopes v. Kapiloani Med. Ctr. for Women & Children, 410 F. Supp. 2d 939, 947 (D. Haw. 2005) (same). We assume, without deciding, the McDonnell Douglas analysis applies. Ritten, 611 F. Supp. 2d at 716 ("As the parties observe, there is no case law addressing the standards that should govern a claim under the EMTALA's anti-retaliation provision, so both sides have agreed that it is appropriate to analyze Plaintiff's claim under the standards that govern Title VII claims of retaliation.").

"Under McDonnell Douglas, the initial burden is on the plaintiff to establish a prima facie case." Pedersen v. Bio-Med. Applications of Minn., 775 F.3d 1049, 1054 (8th Cir. 2015) (quoting Buytendorp v. Extendicare Health Servs., Inc., 498 F.3d 826, 834 (8th Cir. 2007)). To establish a prima facie case, a plaintiff must prove: "(1)

conduct by the employee that is protected by the Act, (2) an adverse employment action directed at the employee, and (3) a causal connection between the protected conduct and the adverse action." Id. "If the plaintiff establishes a prima facie case, a burden shifts to the employer to articulate a legitimate reason for the adverse action." Id. Once a legitimate reason is articulated, the burden then shifts back to "the plaintiff to prove that the proffered reason is merely a pretext and that retaliatory animus motivated the adverse action." Id.

Similarly, to establish retaliation under the False Claims Act, the "plaintiff must prove that (1) the plaintiff was engaged in conduct protected by the [False Claims Act]; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity." Schell v. Bluebird Media, LLC, 787 F.3d 1179, 1187 (8th Cir. 2015) (quoting Schuhardt v. Washington Univ., 390 F.3d 563, 566 (8th Cir. 2004)).

Assuming without deciding Dr. Elkharwily established prima facie cases under the Minnesota Whistleblower Act and EMTALA or that he engaged in protected conduct under the False Claims Act, he failed to establish his employment termination was pretext for retaliation or motivated solely by his reports of Minnesota Whistleblower Act, EMTALA, or False Claims Act violations. Rather, Mayo articulated a legitimate, nondiscriminatory reason for terminating Dr. Elkharwily's employment; namely, his poor job performance. Although Dr. Elkharwily argues Mayo's performance evaluations and IV Tylenol investigation were shams to terminate his employment, this argument is not supported by the record. Dr. Elkharwily's performance evaluations were either required for all employees under the Albert Lea Clinic policy or specifically required for Dr. Elkharwily because of his participation in the HPSP. Further, the evaluations were confidential, based on feedback from numerous staff interviews, and performed independently of each other. Mayo's investigation into the IV Tylenol incident was also the proper protocol in

-12-

response to Dr. Elkharwily's inconsistent version of the events which raised legitimate patient-safety concerns.

Mayo terminated Dr. Elkharwily's employment for poor job performance. Nothing in the record suggests pretext of retaliatory motive. Dr. Elkharwily failed to meet his burden of establishing pretext for retaliation under the Minnesota Whistleblower Act and EMTALA, or that Mayo's decision to terminate his employment was "solely motivated" by his reports of False Claims Act violations.

We affirm the grant of summary judgment to Mayo.

E

Dr. Elkharwily argues the district court abused its discretion by denying his motion for reconsideration of the district court's order striking his 51-page declaration. Reviewing for abuse of discretion, we disagree. *See* Lowry ex rel. Crow v. Watson Chapel Sch. Dist., 540 F.3d 752, 763 (8th Cir. 2008).

The district court did not abuse its discretion by striking Dr. Elkharwily's 51-page declaration that doubled the word limit under the local rules. See D. Minn. LR 7.1(f)(1). "[T]he district court has considerable leeway in the application of its local rules." Silberstein v. I.R.S., 16 F.3d 858, 860 (8th Cir. 1994). The district court accepted Dr. Elkharwily's over-length response brief and acted within its discretion to deny the 51-page declaration he tried to incorporate by reference. The district court also did not abuse its discretion in denying the motion to reconsider.

F

Dr. Elkharwily argues the district court abused its discretion in denying his motion under Rule 56(d) to defer summary judgment for additional discovery.

Reviewing for abuse of discretion, we disagree. *See* <u>Toben v. Bridgestone Retail Operations, LLC</u>, 751 F.3d 888, 895 (8th Cir. 2014) (quoting <u>Stringfellow v. Perry</u>, 869 F.2d 1140, 1143 (8th Cir. 1989)) ("District courts are afforded wide discretion in their handling of discovery matters.").

The district court was well within its wide discretion to deny Dr. Elkharwily's motion to defer the summary judgment ruling. By Rule 56(d), a court may defer considering a motion for summary judgment or allow time for discovery "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). Dr. Elkharwily moved to defer the summary judgment ruling in order to conduct more discovery. However, not only did Dr. Elkharwily engage in exhaustive discovery through two years of litigation but the district court had already granted him three additional depositions on top of the ten under the scheduling order. Dr. Elkharwily had no meritorious justification for additional discovery. The district court did not abuse its discretion.

III

The judgment is affirmed.[4]

_____

_____

[4]We have examined the other issues raised by Dr. Elkharwily and find none merits discussion. We affirm those issues without comment. <u>See</u> 8th Cir. R. 47B.