**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-4307
_____

MARIE GILLISPIE,
Appellant

v.

REGIONALCARE HOSPITAL PARTNERS INC;
ESSENT HEALTHCARE WAYNESBURG LLC,
d/b/a Southwest Regional Medical Center;
ESSENT HEALTHCARE PENNSYLVANIA INC;
ESSENT HEALTHCARE INC;
ESSENT HEALTHCARE;
SOUTHWEST REGIONAL MEDICAL CENTER

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D. C. Civil No. 2-13-cv-01534)
District Judge: Honorable Mark R. Hornak

_____

Argued on September 26, 2017

Before: SMITH, Chief Judge, McKEE and RESTREPO,
Circuit Judges

(Opinion filed: June 12, 2018)

Noah Geary          (**Argued**)
Suite 225
Washington Trust Building

Washington, PA 15301

     Counsel for Appellant


Marla N. Presley    (**Argued**)
Bethany S. Wagner
Jackson Lewis
1001 Liberty Avenue
Suite 1000
Pittsburgh, PA 15222

     Counsel for Appellee


———————————

OPINION OF THE COURT

———————————


McKEE, <u>Circuit Judge</u>


   We are asked to determine whether the District Court erred in dismissing a claim under the "whistleblower" protection provision of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. The dispute here arises from Marie Gillispie's allegations that the Southwest Regional Medical Center (the "Medical Center") terminated her employment because she reported the Medical Center's allegedly improper discharge of an unstable patient and because she reported its alleged substandard care of an admitted patient.

   The District Court granted summary judgment in favor of the Medical Center based upon its conclusion that Gillispie had not established a prima facie case for retaliation under EMTALA and because various common law claims that Gillispie included in her complaint were preempted by state statutes. For the reasons that follow, we will affirm.

**I.**

**A.**   **Legal Background**

Although hospital emergency rooms were once used primarily to treat life-threatening injuries and serious medical conditions, they have since morphed into little more than primary care facilities for those who cannot afford routine medical care.[1]

This shift from medical emergency management to primary care treatment has resulted in a "grave financial challenge" for hospital administrators.[2] Many of them responded to this economic pressure by engaging in a practice known as "patient dumping." That term refers to the practice of refusing to offer emergency room treatment to indigent patients who lack medical insurance, or transferring them to other medical facilities before their emergency medical condition has been stabilized.[3] Congress attempted to address this situation by enacting EMTALA.[4] EMTALA imposes certain mandates on hospitals regardless of whether a patient who presents to an emergency room has the ability to pay for treatment.[5]

---

[1] *See* Kevin Grumbach et al., *Primary Care and Public Emergency Department Overcrowding*, 83 Am. J. Pub. Health. 372, 372 (1993), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1694659/pdf/amjph00527-0070.pdf.

[2] *Genova v. Banner Health*, 734 F.3d 1095, 1097 (10th Cir. 2013); *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 173 (3d Cir. 2009) ("Congress enacted EMTALA in the mid-1980s based on concerns that, due to economic constraints, hospitals either were refusing to treat certain emergency room patients or transferring them to other institutions.") (citing 68 Fed. Reg. 53,222, 53,223 (Sept. 9, 2003)).

[3] *Torretti*, 580 F.3d at 173.

[4] *Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 856 (4th Cir. 1994) (internal quotation marks omitted) ("Congress enacted EMTALA to address a growing concern with preventing 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions were stabilized." (citation omitted)).

[5] *Id.*

3

EMTALA requires hospitals to first examine each patient to determine whether an emergency medical condition exists.[6]  "[I]f the examination reveals the patient is suffering from an emergency medical condition, the hospital usually must stabilize the patient before getting into the business of trying to [discharge or] transfer him [or her] elsewhere."[7]  A hospital that either (1) fails to properly screen a patient, or (2) releases a patient without first stabilizing his or her emergency medical condition thereby violates EMTALA.[8]

Congress included a whistleblower provision in EMTALA to maximize the likelihood that violations would be reported, and that employees who reported them would not be punished by the employer hospital.  That provision states in relevant part:  "A participating hospital may not penalize or take adverse action . . . against any hospital employee because the employee reports a violation of a requirement of this section."[9]

## B.    Factual Background

Marie Gillispie, a registered nurse, worked for the Southwest Regional Medical Center[10] for 13 years and held the position of Quality Project Coordinator when she was terminated in November 2012.  Her responsibilities as Quality Project Coordinator included evaluating patient care as well as addressing patient care issues involving possible medical errors.

On October 23, 2012, a pregnant patient, whom we will call "E.R.," went to the Medical Center's emergency room

---

[6] 42 U.S.C. § 1395dd(a).

[7] *Genova*, 734 F.3d at 1097 (citation omitted); *see also* 42 U.S.C. § 1395dd(b)(1).

[8] A negligent violation of these provisions can subject a hospital or physician to civil penalties not exceeding $50,000. 42 USC § 1395dd(d)(1)(A).  Additional penalties are provided for gross violations of EMTALA.

[9] 42 U.S.C. § 1395dd(i).

[10] Appellee Essent Healthcare owns and operates the Medical Center, which also operates as a subsidiary of Appellee RegionalCare Hospital Partners, Inc.

complaining of discomfort, pain and vaginal bleeding. After examining E.R., the Medical Center's emergency room personnel discharged her and instructed her to "[g]o directly to Uniontown Hospital" to see a gynecologist. The Medical Center did not have a gynecologist on staff.[11] The Medical Center's personnel did not transport E.R. to Uniontown Hospital, and they were unable to contact Uniontown to confirm whether E.R. got there.

The next day, October 24, 2012, Cynthia Cowie, who was the Medical Center's Chief Executive Officer, organized a telephone conference to discuss what had happened to E.R. the night before. Gillispie participated in that call in her role as Quality Project Coordinator.

On October 25th, the day after the conference call, a root cause analysis (RCA) meeting was called to investigate whether E.R.'s discharge violated EMTALA and to determine whether the circumstances surrounding E.R.'s discharge triggered any reporting requirements under EMTALA.

Gillispie contends that she insisted that EMTALA required the appropriate personnel at the Medical Center to report the circumstances surrounding E.R.'s discharge to the Pennsylvania Department of Health and/or the Pennsylvania Patient Safety Authority.[12] Despite Gillispie's alleged

---

[11] Appellant's App'x Vol. I 11.

[12] The Centers for Medicare and Medicaid Services (CMS) and the Office of Inspector General (OIG) are jointly responsible for enforcing EMTALA. The CMS authorizes investigations of EMTALA violations by State agencies and determines if a violation occurred. 42 C.F.R. § 489.20(m). The OIG assesses monetary penalties against violators. 42 C.F.R. § 1003.500(a). Although EMTALA does not require violators to self-report instances of non-compliance, "[i]t should be considered a mitigating circumstance if a hospital took appropriate and timely corrective action in response to the violation." 42 C.F.R. § 1003.520(a). Any "corrective action [though]. . . must include disclosing the violation to CMS prior to CMS receiving a complaint regarding the violation from another source or otherwise learning of the

insistence that EMTALA required the Medical Center to self-report, Cowie instructed the meeting attendees not to report the incident.[13] Nevertheless, at the conclusion of the RCA meeting, Cowie did instruct two of the Medical Center's directors to visit Uniontown Hospital to follow-up on E.R.'s treatment.

Cowie convened a second meeting on October 25, 2012. According to Gillispie's deposition, everyone in that meeting agreed that the Medical Center's discharge of E.R. failed to comply with EMTALA.[14] Gillispie claimed that she and two other attendees argued that the Medical Center therefore had a legal obligation to report the circumstances of E.R.'s discharge to the appropriate agency or authority.[15] According to her deposition, Gillispie told the group "I think it's better to be on the safe side of safety and report it because they're gonna find out anyway . . .."[16] Gillispie also claims that she "protested with [Cowie] several times, or protested with the group several times that [they] better let them know because it would come out."[17] Despite Gillispie's alleged insistence, Cowie steadfastly maintained that the incident did not have to be reported. Consequently, no one at the Medical Center reported E.R.'s discharge to any regulatory authority or agency.

Representatives of the Pennsylvania Department of Health did arrive at the Medical Center the next day, but they did not come to investigate E.R.'s discharge. Rather, they came to investigate a complaint regarding a patient with the initials L.S. L.S.'s family had complained that, despite Cowie's contrary representations to them, the Medical Center had failed to discipline nurses for the poor care L.S. had received at the Medical Center. L.S.'s family had complained that L.S. was given all of his medications at once despite his inability to swallow the pills simultaneously. The family also

---

violation." *Id.* Gillispie argues she told Appellees that there was a duty to report E.R.'s discharge. *See* Appellant's Br. 9.

[13] Report & Recommendation Mot. to Dismiss 3; SA 186.

[14] Appellees' App'x 206.

[15] Appellant's App'x 206–07.

[16] Appellant's App'x 206.

[17] Appellant's App'x 207.

complained that L.S. had not received certain medications on two separate occasions.

During an interview related to that investigation, Gillispie told the investigators about her involvement in the Medical Center's internal review of L.S.'s treatment. She informed them that only one of the two nurses who had been assigned to L.S. had been disciplined for errors in his treatment. According to Gillispie, Cowie had falsely told L.S.'s family that both nurses had been disciplined.

That same day, Cowie learned of a letter that Gillispie had prepared to aid the Department of Health with its inquiry into L.S.'s treatment. According to Cowie, Gillispie claimed that the letter had previously been drafted in connection with the Medical Center's July 2012 investigation into L.S.'s care. The document was, in fact, dated July 2012, but the Medical Center's information technology personnel determined that the letter had not been created until the day of the Department of Health's investigation into L.S.'s treatment and that it had been backdated. At the conclusion of the Department of Health's visit, Cowie met with Gillispie and told her to leave the Medical Center's premises for the day.

Gillispie complied, but, at Cowie's request, she returned to the Medical Center on November 1, 2012—six days after the Department of Health's visit. Upon her return, Gillispie met with Cowie and gave her a letter that included the following text:

> I am also concerned about the EMTALA violation that occurred last week regarding the pregnant female and transfer of her from our ER to Uniontown Hospital's ER. This is a serious EMTALA violation. As you know, you informed us that you decided to not report this incident to the Department of Health. As I stated to you at the meeting last week, I believe we must self-report this incident. Pam Carroll spoke up as well and agreed with me. I struggle to understand your reasons for deciding to not report this incident. I again suggest that you do

7

so, immediately, as it would be in the Hospital's best interest.[18]

Cowie terminated Gillispie's employment at the conclusion of that meeting.

Although Gillispie had not reported the Medical Center's discharge of E.R. to any agency prior to her termination, she did subsequently report it.[19] She also filed this suit alleging that her termination violated EMTALA's whistleblower protection.

## C.    Procedural History

Gillispie's original five-count complaint alleged that her discharge violated EMTALA as well as Pennsylvania's public policy. She subsequently amended the complaint by adding four counts under the Pennsylvania Medical Care Availability and Reduction of Error (MCARE) Act.[20] The District Court subsequently dismissed those counts because the applicable statute of limitations had passed.

Thereafter, a Magistrate Judge filed a Report and Recommendation recommending that the Medical Center be granted summary judgment on each of the five original counts because Gillispie had not established that she had engaged in any protected activity. The judge also recommended that her remaining state law claims be dismissed because she had a statutory remedy for any such violations and therefore was not entitled to relief based upon violation of public policy. The District Court agreed and entered an order awarding appellees summary judgment. This timely appeal followed.[21]

---

[18] Appellant's Br. 11 (footnote added).

[19] SA 24–32.

[20] 40 Pa. Cons. Stat. § 1303.101 *et seq*.

[21] The District Court had federal question jurisdiction over Gillipsie's EMTALA claim pursuant to 28 U.S.C. § 1331. It had supplemental jurisdiction to hear Gillipsie's state law claims pursuant to 28 U.S.C. § 1367. The grant of summary judgment constitutes a final order. Thus, we have appellate jurisdiction under 28 U.S.C. § 1291.

## II.

In reviewing a District Court's grant of summary judgment, we apply the same test the District Court utilized, "viewing those inferences that may be drawn from the underlying facts in a light most favorable to the nonmoving party."[22] "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."[23] However, when a party alleges facts that are blatantly contradicted by the record, we will "not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[24]

## III.

As we noted at the outset, Gillispie claims that the Medical Center's Chief Executive Officer fired her in retaliation for reporting an EMTALA violation based on the Medical Center's discharge of E.R., thus violating the whistleblower protection contained in EMTALA. Gillispie also contends that, to the extent her termination was motivated by her participation in the Department of Health's investigation of L.S.'s care, it also violated Pennsylvania public policy. We address each argument in turn.

### 1.

"In the absence of direct evidence of retaliation, courts [have applied] the *McDonnell Douglas*[25] burden-shifting framework to . . . [whistleblower claims]" under EMTALA.[26] That familiar approach was developed for claims brought under Title VII of the Civil Rights Act of 1964.[27] Although we

---

[22] *Figueroa v. Buccaneer Hotel Inc.*, 188 F.3d 172, 175 (3d Cir. 1999) (citation and internal quotation omitted).

[23] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587 (1986) (citation and internal quotation marks omitted).

[24] *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[25] *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

[26] *See Elkharwily v. Mayo Holding Co.*, 823 F.3d 462, 470 (8th Cir. 2016) (collecting cases).

[27] 42 U.S.C. §§ 2000e *et seq*.

9

have not yet specifically decided if we should apply that framework to resolve EMTALA claims, "we have found that if a statute does not provide for a burden-shifting scheme, *McDonnell Douglas* applies as the default burden-shifting framework."[28] Accordingly, we take this opportunity to hold that, absent direct evidence of retaliation, we should apply the burden-shifting scheme utilized in *McDonnell Douglas* to resolve whistleblower claims under EMTALA.[29]

Accordingly*,* Gillispie must first establish a prima facie case of retaliation by producing sufficient evidence to prove: (1) she engaged in conduct that is protected by EMTALA; (2) her employer subsequently took an adverse employment action against her; and (3) the employer did so because she engaged in protected activity. [30] As with Title VII claims, Gillispie need not prove an actual EMTALA violation. Rather, she need only establish that "[s]he was acting under a good faith, reasonable belief that a violation existed."[31] The District Court concluded that Gillispie had not established such a prima facie case because she had not "made a 'report' as that term is considered under EMTALA."[32]

EMTALA's whistleblower provision protects only employees who have "report[ed] a violation" of one of the statute's provisions.[33] The District Court held that Gillispie's conduct was, at most, an expression of disagreement with the Medical Center's decision not to report a violation, rather than an actual report of an EMTALA violation.[34] On appeal, Gillispie argues that her EMTALA claim must survive summary judgment because she produced sufficient evidence to show that she had made a report within the meaning of the

---

[28] *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 157–58 (3d Cir. 2013) (citations omitted).

[29] The parties here agree that this is the correct approach to resolve this dispute.

[30] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (citation omitted).

[31] *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (citation and internal quotation marks omitted).

[32] Appellant's App'x Vol. I 3.

[33] 42 U.S.C. § 1395dd(i).

[34] Appellant's App'x Vol. I 4.

statute and that this report resulted in her retaliatory termination.

## A.

The text of EMTALA does not define "report," and there is a dearth of case law defining that term as it is used in EMTALA's whistleblower provision. Accordingly, we must begin with the premise that Congress intended the ordinary meaning of that term.[35] If the language is clear, our inquiry is at an end.[36]

The Supreme Court has explained that "[a] 'report' is 'something that gives information' or a 'notification,' . . . or '[a]n official or formal statement of facts or proceedings[.]'"[37] Put another way, it is "[a]n account brought by one person to another."[38] Thus, the term ordinarily refers to nothing more than the transmission of information. Given the absence of ambiguity in the text of EMTALA, our inquiry into the meaning of "report" need proceed no further. Viewing the record and all reasonable inferences derived therefrom in the light most favorable to Gillispie, it is clear that she failed to establish that she actually provided any information of an alleged EMTALA violation to anyone.

---

[35] *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–76 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" (internal quotation marks omitted)); *see also Araujo,* 708 F.3d at 158 ("Statutory analysis begins with the plain language of the statute, 'the language employed by Congress.'" (citation omitted)).

[36] *Robinson*, 519 U.S. at 340 (citation omitted).

[37] *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 408–09 (2011) (citing Webster's Third New International Dictionary 1925 (1986); Black's Law Dictionary 1300 (6th ed. 1990).

[38] *Schindler Elevator Corp.*, 563 U.S. at 408 (citing 13 Oxford English Dictionary 650 (2d ed. 1989)).

It is undisputed that the aforementioned series of meetings occurred on October 25, 2012. The first was the RCA meeting, which Cowie convened to investigate whether the Medical Center's care of E.R. complied with EMTALA. The second meeting was a follow-up to the first.

The parties disagree about exactly what happened in those meetings. Gillispie alleges that she first voiced her view that the Medical Center's discharge of E.R. violated EMTALA at the RCA meeting.[39] However, the District Court concluded that was not supported by the record. We agree; the record does not support Gillispie's claim that she made such an assertion at the initial meeting.

During his deposition, Michael Onusko, the Medical Center's Senior Administrative Director of Emergency Outpatient and Environmental Services, testified that, at the end of the RCA meeting, all of the attendees "felt comfortable" with the conclusion that the Medical Center had not violated EMTALA."[40] That testimony is consistent with other evidence in this record. A document labeled "Staff Timeline" indicates that, on October 25th, "it was decided . . . that this was not a potential EMTALA violation and would not be reported as such."[41] In addition, the following people attended the RCA meeting: Kathi Comandi, the Medical Center's Chief Nursing Officer; Pamela Carroll, the Medical Center's Chief Quality Officer; and Bridgett Trump, the Medical Center's Director of the Emergency Department and Intensive Care Unit. They agreed that each attendee believed that the Medical Center's handling of E.R.'s visit had not violated EMTALA.[42] Gillispie's contention to the contrary is further undermined by her own deposition. She testified that the first meeting was a "fact-finding meeting"[43] and that "at the end of [the first] meeting . . . Cindy had made a decision to send Bridget Trump and Mike Onusko to Uniontown Hospital that evening."[44] When asked to recount the details of that meeting, Gillispie did

---

[39] SA 187; Appellant's App'x 268; Appellant's Br. 19.

[40] SA 122–24.

[41] SA 101–02.

[42] SA 86, 87, 03–04.

[43] Appellant's App'x 204.

[44] Appellant's App'x 205.

not testify that she told the attendees she believed the Medical Center's discharge of E.R. violated EMTALA and that it should have been reported.

Although Gillispie is entitled to the benefit of all reasonable factual inferences at this stage, she must nevertheless point to some evidence in the record to support her factual assertions.[45] We agree with the District Court's conclusion that she failed to do so.

**2.**

Gillispie also contends that she reported the Medical Center's alleged violation during the second meeting. Her assertion is once again contradicted by her own deposition. According to her deposition, the second meeting began with an overview of the discussion Trump and Onusko had with Uniontown Hospital—the hospital to which E.R. had been referred. Gillispie testified that after Trump and Onusko reported on their meeting with Uniontown Hospital, "there was a discussion. [Cowie] said, [] we won't report this, we just had some EMTALA close calls in the last few weeks."[46] Gillispie testified that she responded by saying: "I think it's better to be on the side of safety and report it . . . ."[47] She also testified that "[e]verybody in that meeting" "decided it was an EMTALA violation but it would not be reported . . . ."[48] The decision not to report the violation—which, according to Gillispie, everyone acknowledged—went unchanged even after Gillispie "protested with the group several times that . . . we better let them know because it would come out."[49]

Thus, according to Gillispie's own deposition, the attendees in the meeting were all aware of the potential EMTALA violation absent any information (or "report") from

---

[45] Fed. R. Civ. P. 56(e); *see also Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("Summary judgment is the put up or shut up moment in a lawsuit.") (citation and internal quotation marks omitted).

[46] Appellant's App'x 206.

[47] Appellant's App'x 206.

[48] Appellant's App'x 206.

[49] Appellant's App'x 206.

13

her. Gillispie neither alleged nor testified that the Medical Center personnel concluded that E.R.'s discharge violated EMTALA only *after* she notified them of the circumstances surrounding it. Any such evidence would paint a very different picture than the one that was before the District Court. Instead, Gillispie's deposition establishes that she expressed a contrary opinion about E.R.'s care only after everyone had already "decided it was an EMTALA violation but it would not be reported . . . ."[50]

We appreciate that Gillispie purportedly urged the attendees at the October meetings to report the circumstances surrounding E.R.'s discharge and told them that they "better let [the regulatory agencies] know because it would come out."[51] However, the chronology is significant here. Gillispie's deposition establishes that her efforts occurred only after Cowie and the other attendees had already concluded that E.R.'s discharge was a violation of EMTALA. That testimony is fatal to her attempt to now claim that she is entitled to the sanctuary of EMTALA's whistleblower provision because she made a "report" under EMTALA. It is clear that she did not provide any "information" or "notification" about E.R.'s discharge, and she does not allege anything to the contrary.[52] Rather, she testified that she merely disagreed with that decision.

Gillispie's claimed protests that the better course would have been for the Medical Center to self-report the violation was not, without more, a "report" under EMTALA. They did not inform the Medical Center's management of anything that was not already known. As the District Court explained, Gillispie's "argument would appear to boil down to an assertion that EMTALA's anti-retaliation provisions reach . . . an employee's disagreement (which we must and will presume

---

[50] Appellant's App'x 206.

[51] Appellant's App'x 207.

[52] *See Schindler Elevator Corp.*, 563 U.S. at 407–08. We realize, of course, that the Court was interpreting "report" as used in a different statute (the False Claims Act) in *Schindler Elevator*. However, the Court clearly stated that it was applying the ordinary meaning of "report" because there, as here, the statute did not define the term. *See id.*

14

here to have been made in good faith) with the decision of hospital management not to report as an EMTALA violation a specific episode."[53]

Title VII's anti-retaliation provision is once again illustrative. Unlike EMTALA, Title VII provides protection against retaliatory discharge of an employee who "opposed" a Title VII violation or "participated in any manner" in an investigation into a violation.[54] We cannot ignore the difference between the breadth of that protection and the much narrower protection Congress provided under EMTALA for an employee who reports a violation. Congress had the benefit of hindsight when it drafted EMTALA, and its decision to exclude certain conduct that would be protected under Title VII suggests that EMTALA's whistleblower protection is narrower than the analogous provision of Title VII.[55]

It is undisputed that Gillispie did not give anyone at the Medical Center any information about E.R.'s emergency room visit or discharge that they were not already aware of. Thus, Gillispie has failed to demonstrate that she engaged in activity protected by EMTALA's whistleblower provision. She did not make a "report" and cannot establish a prima facie case for relief as a protected whistleblower under EMTALA.[56]

**3.**

---

[53] Appellant's App'x Vol. I 4.

[54] 42 U.S.C. § 2000e-3(a).

[55] *See Richerson v. Jones*, 551 F.2d 918, 928 (3d Cir. 1977) ("[W]here a statute with respect to one subject contains a specific provision, the omission of such provision from a similar statute is significant to show a different intention existed. This principle of construction applies with equal force to statutory words." (citation and internal quotation marks omitted)).

[56] The defendants also assert that, even if Gillispie has established a *prima facie* case of whistleblower retaliation, her claim nonetheless fails because Gillispie has not shown that the defendants' claim that it fired her only because she backdated a document was pretextual. Given our holding that she cannot establish that she engaged in protected conduct, we need not reach this issue.

In dismissing Gillispie's EMTALA claim, the District Court explained: "there is no record evidence that the Plaintiff went to any governmental or regulatory agency with a 'report' of an EMTALA violation." [57] However, no such evidence is necessary to establish that a "report" of an EMTALA violation has been made. Had Congress intended to limit EMTALA's whistleblower protections to information given to regulatory agencies or governmental authorities, it could have easily done so. [58] Title 42 U.S.C. § 1395dd(i) is not limited to employees who make "official reports" or who report violations to regulatory or governmental agencies. Rather, Congress more broadly provided that "participating hospital[s] may not penalize . . . any hospital employee because the employee reports a violation of " EMTALA. Congress clearly intended to include the transmission of information under the protective umbrella of a "report." Thus, covered medical facilities cannot penalize anyone who informs someone about something that s/he believes in good faith to be a violation of EMTALA that was not otherwise known or had not otherwise been discovered.

Indeed, a contrary interpretation would strip employees (and patients) of the very protection Congress intended to provide in enacting this statute. It would encourage medical facilities to quickly fire any employee who made an internal report of a violation before the report was made to an outside authority. In such a situation, the hospital could correctly claim that the employee had not been penalized for any report under EMTALA because no such report had been made when the employee was penalized.

Accordingly, we hold that EMTALA's whistleblower provision protects employees who inform personnel in a covered facility of a possible EMTALA violation even though the employee does not also inform any governmental or regulatory agency.

**4.**

---

[57] Appellant's App'x Vol. I 3.

[58] *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998) (noting that we must construe remedial legislation liberally).

Count II of the amended complaint alleged that the Medical Center discharged E.R. in violation of the safeguards provided by statutory and common law.[59] Count V alleged that the Medical Center provided L.S. with poor care by giving him his medications all at once and twice failing to give him medications individually.[60]

In Pennsylvania, an employer may terminate an employee without cause provided that "the dictates of public policy," contract, or a statutory provision do not prohibit such termination.[61] Absent any such prohibition, there is no common law cause of action in Pennsylvania for "wrongful termination."[62] Gillispie argues that, even though she claims wrongful termination in counts II and V, her claims may nevertheless survive summary judgment because they allege violations of various public policies. We have previously determined that Pennsylvania law does not recognize a common law cause of action for violating public policy if a statutory remedy exists. As we explained in *Wolk v. Saks Fifth Ave., Inc.*, "the availability of a [statutory] remedy precludes other common law remedies even where the statute is not invoked." [63] Although Gillispie's wrongful discharge claims are cloaked in the rhetoric of public policy, they are clearly prohibited as common law claims for violation of public policy because she could have brought them under Pennsylvania's MCARE Act.

---

[59] SA 188–89

[60] Appellant's App'x Vol. I 35.

[61] *Spierling v. First Am. Home Health Servs., Inc.*, 737 A.2d 1250, 1253 (Pa. 1999) (citation omitted); *see also Geary v. U.S. Steel Corp.*, 319 A.2d 174, 180 (Pa. 1974) (noting that "an employee at will has no right of action against his employer for wrongful discharge" where "no clear mandate of public policy is violated").

[62] *See, e.g.*, *Geary*, 319 A.2d at 180; *see also, Clay v. Advanced Computer Applications, Inc.*, 559 A.2d 917, 918 (Pa. 1989) ("It should be noted that, as a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship.").

[63] 728 F.2d 221, 224 n. 3 (3d Cir. 1984).

17

Although counts II and V of Gillispie's amended complaint explicitly allege that the appellees "violated, undermined[,] and implicated . . . the MCARE Act[,]" she now contends that the MCARE Act is inapplicable. [64] Her belated attempt to disclaim the MCARE Act, despite relying upon it at the outset, is likely explained by the District Court's determination that counts VI-IX, which were brought solely pursuant to the MCARE Act, were time-barred by the applicable statute of limitations.[65] If she is correct about the inapplicability of the statute, the MCARE Act would not preclude her from recovering based upon common law and public policy. But Gillispie is wrong. Despite her protestations to the contrary, Gillispie's claims are covered by the MCARE Act, and she is therefore precluded from relying on the alleged violations of common law and public policy.

Pennsylvania's MCARE Act expressly incorporates the provisions of the Pennsylvania Whistleblower Law. The MCARE Act provides in relevant part as follows:

> [a] health care worker who reports the occurrence of a **serious event or incident** . . . shall not be subject to any retaliatory action for reporting the serious event or incident and shall

---

[64] Am. Compl. ¶¶ 48 (count II), 122 (count V), ECF No. 32. The "MCARE Act" refers to The Medical Care Availability and Reduction of Error Act of March 20, 2002.P.L. 154, *as amended,* 40 P.S. § 1303.101–1303.910, replaced its predecessor, the Health Care Services Malpractice Act (Malpractice Act) of October 15, 1975, P.L. 390, No. 111 § 101 *et seq., as amended,* 40 P.S. § 1301.101 *et seq.* The MCARE Act was established to safeguard reasonable compensation for victims of medical negligence and malpractice.

[65] *Gillispie v. Regionalcare Hosp. Partners, Inc.*, 2015 WL 1839149, at *1 (W.D. Pa. Apr. 21, 2015) (noting that Gillispie "failed to assert her claims within the 180-day statute of limitations set forth in the Pennsylvania Whistleblower Statute, [43 Pa. Cons. Stat. § 1424(a)]").

18

have the protections and remedies set forth in . . . the Whistleblower Law.[66]

Pennsylvania's Whistleblower Law generally provides a civil cause of action for an employee whose public employer retaliates for reporting the employer's "wrongdoing or waste."[67] As we have explained, Gillispie is alleging that she was terminated in retaliation for reporting the Medical Center's discharge of E.R. (count II) and deficient care of L.S. (count V). Her claims fall squarely within the ambit of the MCARE Act if they involve either an "incident" or a "serious event." Gillispie concedes that she is not alleging she reported a serious event. Accordingly, we need only determine if her claim involves an "incident" under Pennsylvania law.[68]

> The Whistleblower Law defines an "incident" as: [a]n event, occurrence or situation involving the clinical care of a patient in a medical facility which could have injured the patient but did not either cause an unanticipated injury or require the delivery of additional health care services to the patient.[69]

Count II clearly alleges retaliation for Gillispie's alleged report of an "incident." It is uncontested that E.R.'s discharge could have, but did not, result in injury.[70] Gillispie argues E.R.'s discharge does not qualify as an "incident" because it did require the delivery of additional health care. She does not cite to anything in the record in making this argument. Accordingly, as the District Court correctly held, Gillispie's assertion is unavailing because it completely lacks

---

[66] 40 Pa. Cons. Stat. § 1303.308(c) (emphasis and footnote added).

[67] 43 Pa. Cons. Stat. § 1423(a).

[68] A "serious event" is "an event, occurrence or situation involving the clinical care of a patient in a medical facility that results in death or compromises patient safety and results in an unanticipated injury requiring the delivery of additional health care services to the patient." 40 Pa. Cons. Stat. § 1303.302.

[69] *Id.* § 1303.302 (footnote added).

[70] *See* Appellant's Br. 29; SA 220.

19

evidentiary support.[71]  Thus, we agree with the District Court's conclusion that the claims in count II clearly could have been brought pursuant to the MCARE Act.

Count V, which concerns the treatment of L.S., is similarly precluded because it too could have been brought under the MCARE Act.  In an attempt to remove the claim from the ambit of the MCARE Act, Gillispie argues that her report to the Department of Health regarding L.S.'s care did not involve an "incident" because the alleged poor care could not have caused L.S. injury.[72]  But again, Gillispie has failed to produce evidence to defeat a motion for summary judgment. The District Court therefore had "little difficulty finding that a hospital patient receiving medication in a manner ill-suited for his physiology as well as failing to receive required medication as needed could have resulted in an injury to him and/or required that he received additional health care services."[73] Gillispie has made no attempt to refute this finding, and contrary evidence does not exist in the record.[74]

The MCARE Act provides Gillispie with a statutory remedy, and, as a result, she may not also allege a public policy-based wrongful discharge claim.  Accordingly, counts II and V of the amended complaint were properly dismissed.

**5.**

In an eleventh-hour attempt to save counts II and V, Gillispie now contends the public policy-based claims survive even in the light of an applicable remedial statute because any available remedies would be inadequate.  In Pennsylvania, a

---

[71] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (summary judgment should be entered against nonmoving party who fails to make showing sufficient to establish existence of element essential to that party's case).

[72] Appellant's App'x Vol. I 35.

[73] Appellant's App'x Vol. I 35.

[74] At the motion to dismiss stage, the District Court did not dismiss counts II and V along with counts VI–XI because it could not, at that stage, determine whether the claims fell under the MCARE Act.  Now that discovery is complete, it is clear that counts II and V are encompassed by that Act.

20

statutory remedy is inadequate only if it either (1) does not allow adjudication of the issue raised by the appellant, or (2) allows irreparable harm to occur to the appellant during the pursuit of the statutory remedy.[75]  The MCARE Act provides whistleblowers with the full "protections and remedies set forth in the . . . Whistleblower Law."[76]  Gillispie cannot establish that the MCARE Act's damages are inadequate, and it is not at all apparent that they are.  In any event, the District Court correctly concluded that the claims are now barred by the 180-day limitation period that governs claims brought under the MCARE Act.

## IV.

For the foregoing reasons, we will affirm the judgment of the District Court.

---

[75] *LCN Real Estate, Inc. v. Borough of Wyoming,* 544 A.2d 1053, 1058 n.8 (Pa. Commw. Ct. 1988).
[76] 40 Pa. Cons. Stat. § 1303.308(c).