In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 22-3054

WILLIAM R. PARTIN,

*Plaintiff-Appellant,*

*v.*

BAPTIST HEALTHCARE SYSTEM, INC., d/b/a Baptist Health Floyd
and DANIEL J. EICHENBERGER, M.D.,

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:20-cv-00185 — **Sarah Evans Barker**, *Judge.*

---

ARGUED SEPTEMBER 20, 2023 — DECIDED APRIL 24, 2025

---

Before RIPPLE, JACKSON-AKIWUMI, and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* When Baptist Healthcare System, Inc.,
decided it no longer desired Dr. William Partin's services, he
resigned and filed this lawsuit, alleging that Baptist and its
President, Dr. Daniel Eichenberger, retaliated against him in
violation of the Emergency Medical Treatment and Active La-
bor Act (EMTALA), 42 U.S.C. § 1395dd. Partin also brought
claims under Indiana law, alleging, among other things, that

Baptist had breached its contract with him and had tortiously interfered with his contractual relations and business expectations. Lastly, Partin asserted defamation claims against Eichenberger for certain statements he made in a letter and against Baptist (under a *respondeat superior* theory) for those statements as well as others by Grace Marksbury, a hospital nurse.[1] After discovery, Baptist and Eichenberger filed motions for summary judgment. The district court granted them, and Partin appeals. Because no reasonable jury could find in his favor, we affirm.

## I.

This dispute centers around Partin's treatment of a patient, J.C., in Baptist's emergency department. We recount the incident, construing all facts in Partin's favor.

J.C. was brought by ambulance to Baptist on September 3, 2019, at around 4:00 p.m. J.C. had run into traffic in an attempt to commit suicide. Shortly after her arrival, J.C. tried to leave the hospital, but hospital security brought her back kicking and screaming.

Partin examined J.C. in the emergency room and diagnosed her with depression accompanied by suicidal ideation. He observed that she was combative, exhibited signs of psychosis, and admitted to illegal drug use. Given this, Partin ordered that J.C. be detained for twenty-four hours so that she

---

[1] From the record below, it does not appear that Partin filed a defamation claim against Marksbury directly. She is not named as a defendant in the operative complaint, nor does she appear in the case caption. Furthermore, she was never served with a summons, nor did she ever file an appearance in the case. And she is not named in the judgment below.

could receive emergency treatment to preserve her health and safety (the parties refer to this as a "medical hold"). Shortly thereafter, Partin successfully petitioned a judge to extend J.C.'s medical hold to seventy-two hours. The hospital also placed a security guard at J.C.'s bedside to prevent her from leaving.

Partin's examination of J.C. proved unexceptional, although she did have an elevated heart rate. During the examination, Partin told J.C. that the nurses needed to obtain samples of her blood and urine and administer intravenous fluids to prevent hyperthermia. When J.C. refused, Partin informed her that she had to submit to these procedures even if the hospital staff had to restrain her to gain compliance.

Partin's statements disturbed the hospital staff who believed his instructions were contrary to hospital policy. To their eyes, J.C. was alert and oriented—she was able to state her name, the time, and the month and date of her birth. And they believed J.C. to be generally cooperative. For example, she admitted to feeling depressed and agreed to a psychological consultation. J.C. also agreed to hydrate, drinking nearly a half-gallon of water, and voluntarily provided a urine sample. J.C. also allowed the staff to draw her blood sample, take her vital signs, and administer an EKG. And she later allowed the nurses to document her vital signs, including her oral temperature and heart rate, which were within normal limits by that time. Despite this, Partin ordered that the nurses measure J.C.'s temperature rectally.

The staff requested J.C.'s consent to administer intravenous fluids and take a rectal temperature reading, but she repeatedly refused. Because J.C.'s blood and urine lab results were unremarkable, her vital signs were within normal limits,

she was drinking water, and she was alert and oriented, the staff notified Partin that they believed intravenous fluids and a rectal temperature reading were unnecessary. They also informed Partin that J.C. was coherent and mentally capable of withholding consent.

To confirm their belief that J.C. had the right to decline these procedures, the nurses consulted a hospital social worker, who agreed. Additionally, it did not escape their notice that the judge, who had issued the seventy-two-hour medical hold, had explained that, if the hospital wanted to administer medication to a mentally cogent patient without her consent, it would have to make a greater showing of need.

In Partin's view, J.C. could not refuse the procedures because she was on a medical hold. And so, he ordered the staff to restrain J.C. and perform the procedures against her will. When the staff resisted, Partin consulted Baptist's legal department, and he was advised that J.C. had the right to refuse the procedures and leave against medical advice.

Undeterred, Partin approached Eichenberger, Baptist's President. He told Eichenberger that J.C. was delusional, had an abnormally fast heart rate, and febrile. And, based on this, Eichenberger directed the staff to comply with Partin's order.

On the strength of Eichenberger's instructions, at 6:10 p.m., security guards and staff restrained J.C.'s arms and legs as she began crying and yelling for help. She shouted repeatedly that forcing her to undergo a rectal temperature measurement without consent was tantamount to rape. To make her more compliant, Partin ordered that J.C. be administered ketamine, and, once sedated, she received intravenous fluids and a rectal temperature measurement.

Partin admitted J.C. to a hospital room at around 9:00 p.m. The next morning, J.C. told the nurse that, if the nurse did not extract the intravenous needle from J.C.'s arm, she would do so herself. A hospital staff member then removed the needle, and J.C. refused any further medication or treatment.

Around 3:00 p.m., a psychiatric consultant evaluated J.C. and found her neither psychotic nor suicidal. Accordingly, the consultant requested that the seventy-two-hour hold be discontinued. And, before a doctor could discharge her, J.C. left the hospital.

In the aftermath of the incident, emergency room staff members lodged formal complaints about Partin's conduct. They expressed their dismay that Partin had forcibly treated a cogent patient without consent despite their protestations, risking the patient's safety as well as their own.[2]

Baptist initiated an investigation into these complaints, and Marksbury, who was the Nurse Director of Emergency Services, informed the Chief Nursing Officer, Kelly McMinoway, in an email that Marksbury did not think she could convince the staff to continue supporting Partin. To make matters worse, Marksbury believed that the staff's distrust of Partin could result in additional conflicts.

At this point, it should be noted that Baptist was not Partin's employer. Rather, Partin was employed by Floyd

---

[2] This was not the first time that staff had complained about Partin's behavior in the emergency room. Indeed, between 2002 and 2015, Baptist had received a long list of staff complaints about Partin's clinical work and patient care. But there were no documented complaints against Partin after 2015 until the incident with J.C.

Associates, a medical staffing company, with whom Baptist contracted for emergency department medical personnel, including physicians. Due to the conflict between Partin and the staff, Eichenberger requested that Floyd immediately remove Partin from Baptist. According to Floyd's Medical Director, Kevin Wurst, he felt he had no choice but to tell Partin that he could either resign or be terminated. Partin resigned.

## II.

### A. EMTALA Retaliation Claim

Partin claims that Baptist violated EMTALA by retaliating against him for (1) refusing to discharge J.C., even though the hospital wanted to do so before she was stable, and (2) reporting to Eichenberger that the hospital had failed to sufficiently examine J.C. to determine her condition before she was discharged. The district court determined that no reasonable jury could find that Partin had engaged in EMTALA-protected activity.

EMTALA "was enacted as a response to the nationwide problem of hospitals dumping indigent patients who have no health insurance." *Johnson v. Univ. of Chi. Hosps.*, 982 F.2d 230, 233 n.7 (7th Cir. 1992), *as amended* (Mar. 5, 1993) (internal quotation marks omitted); *see* 42 U.S.C. § 1395dd. "Congress' solution was to guarantee patient entry into the medical system via mandatory appropriate medical screenings and stabilization prior to transfer." *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2002) (*en banc*).

Under the Act, when an individual arrives at a hospital emergency room, "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department … to determine whether or

not an emergency medical condition … exists." 42 U.S.C. § 1395dd(a). "The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly." *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995). If an emergency medical condition exists, stabilizing treatment must be provided before transferring the individual to another medical facility or discharging the individual. 42 U.S.C. § 1395dd(b), (c), (e)(4).

EMTALA provides a private right of action to individuals and medical facilities to redress violations of these provisions. *See id.* § 1395dd(2)(A) & (B). Salient here, the Act also provides protections for physicians:

> A participating hospital may not penalize or take adverse action against … a physician because the … physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

*Id.* § 1395dd(i).[3]

---

[3] The term "transfer" means:

> the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

Both sides agree with the district court that, absent direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework utilized in Title VII cases applies to whistleblower claims under EMTALA. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). We have yet to address this precise issue, but we will assume for the purposes of this appeal that the parties are correct. *Cf. Gillispie v. RegionalCare Hosp. Partners Inc.*, 892 F.3d 585, 592 (3d Cir. 2018) (applying the *McDonnell Douglas* framework to EMTALA retaliation claim); *Elkharwily v. Mayo Holding Co.*, 823 F.3d 462, 470 (8th Cir. 2016) (assuming without deciding that this is correct).

Using the *McDonnell Douglas* approach, "[a] plaintiff must first establish a *prima facie* case of retaliation." *Gillispie*, 892 F.3d at 593. If he is successful, the "burden shifts to the employer to articulate a legitimate reason for the adverse action." *Elkharwily*, 823 F.3d at 470 (internal quotation marks omitted). Assuming the employer can do so, the burden "shifts back to the plaintiff to prove that the proffered reason is merely a pretext and that retaliatory animus motivated the adverse action." *Id.* (internal quotation marks omitted).

To satisfy the first step, Partin must show that a reasonable jury could find that (1) he engaged in statutorily protected activity; (2) his employer subjected him to an adverse action; and (3) the first caused the second. *See Gillispie*, 892 F.3d at 592. Directing our attention to the first element, Partin contends that the district court erred by focusing on whether an EMTALA violation had occurred, rather than on whether he had a reasonable belief that he had engaged in EMTALA-protected activity. But, even under that test, Partin must

---

42 U.S.C. § 1395dd(e)(4).

present facts from which a rational jury could find objectively reasonable his belief that he was dismissed for "refus[ing] to authorize the transfer of an individual with an emergency medical condition that [had] not been stabilized" or for "reporting a violation of" § 1395dd. 42 U.S.C. § 1395dd(i). *See Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021) (noting in the context of a Title VII retaliation claim that a plaintiff's belief he had engaged in statutorily protected activity must be objectively reasonable). Partin has failed on both counts.

First, as evidence that he had refused to discharge J.C. in the face of pressure to do so, Partin points to a paramedic report documenting J.C.'s arrival at the hospital. The report mentions that a hospital employee had told the paramedic that the hospital "could not hold [J.C.] there if she did not want to be there." This, Partin submits, demonstrates that the hospital wanted to discharge J.C. and that he later went against that request when placing J.C. on medical hold. But, by his own admission, Partin was not aware of the paramedic report when he was treating J.C., so this does not help him.

The other evidence Partin offers fares no better. For example, according to Partin, when J.C. arrived at the hospital, a nurse asked him if he could see J.C. "to see if [J.C.] can leave." Partin took this to mean that the nurse affirmatively wanted to discharge J.C. and was asking him to rubber stamp the decision. But this is mere speculation on his part, and it is hornbook law that "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Lavite v. Dunstan*, 932 F.3d 1020, 1029 (7th Cir. 2019) (internal quotation marks omitted).

Second, Partin argues that he was terminated because he had reported two violations of § 1395dd to Eichenberger.

According to Partin, he informed Eichenberger that emergency department staff members were refusing to follow his orders, thereby preventing him from assessing whether J.C. was suffering from an emergency medical condition as EMTALA requires. Additionally, Partin contends, he told Eichenberger that the hospital was going to discharge J.C. before she was stabilized. But neither argument finds support in the record.

As to the former, Partin contends that the staff impeded him from performing the necessary assessment of J.C. by refusing to administer intravenous fluids and take her temperature rectally. But the undisputed facts show that Partin had already diagnosed J.C. with hyperthermia and an elevated heart rate by the time he had ordered these additional procedures. And J.C. had no other emergent medical condition.

At most, Partin's arguments demonstrate a disagreement as to how best to treat J.C.'s emergency medical conditions once she had been diagnosed. But such professional disagreements are beyond EMTALA's reach. *See Harry*, 291 F.3d at 773 ("EMTALA was not intended to establish guidelines for patient care, to replace available state remedies, or to provide a federal remedy for medical negligence.").

As to Partin's second theory, he claims that he informed Eichenberger that J.C. had not been stabilized prior to being discharged. But there is no evidence that anyone at the hospital had discharged or was trying to discharge J.C. by the time Partin spoke with Eichenberger. In fact, J.C. was discharged the following day, after she had received a complete diagnostic review, a psychiatric consultation, and assistance from a social worker.

This does not matter, in Partin's view, because he was reporting a potential *future* EMTALA violation based on his belief that Baptist's legal and risk management departments had opined that J.C. had the right to leave against medical advice. But § 1395dd(i) allows suit only when an "employee reports a violation of a requirement of this section," not a potential one. 42 U.S.C. § 1395dd(i). *See Genova v. Banner Health*, 734 F.3d 1095, 1099 (10th Cir. 2013) (EMTALA "permits suit only when the plaintiff … reported an *existing* EMTALA violation, not an *impending* one").

For these reasons, the district court properly granted summary judgment to Baptist and Eichenberger on Partin's EMTALA claim.

### B. Breach of Contract

Next, we turn to Partin's breach of contract claim against Baptist. Under Indiana law, "[t]he basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds of the contracting parties." *Conwell v. Gray Loon Outdoor Mktg. Grp., Inc.*, 906 N.E.2d 805, 812–13 (Ind. 2009). To determine the intent of the parties, a court must look, not to their subjective beliefs or intent, "but their outward manifestation of it." *Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005). "Whether a contract exists is a question of law." *Conwell*, 906 N.E.2d at 813.

Recall that Partin is employed by Floyd. Thus, to prove the existence of a contract between himself and Baptist, Partin points to the 2016 "Floyd Memorial Hospital and Health Services Medical Staff Bylaws" (2016 Bylaws) and the 2019 "Medical Staff Bylaws Baptist Health Floyd" (2019 Bylaws). As Partin sees it, these bylaws instituted certain procedures

Baptist must follow before asking Floyd to remove Partin from the emergency department. By failing to do this, he contends, Baptist breached its contract with him. But no reasonable jury could find for Partin on this contract claim.

Turning first to the 2016 Bylaws, they unequivocally state: "Under no circumstances shall these Bylaws be construed to create a contractual relationship of any kind between or among the Board of Trustees or Hospital and Medical Staff, any of its members, or any Affiliates." This language clearly manifests the parties' intent to *avoid* creating a contract between Baptist and Partin.

As for the 2019 Bylaws, they do require Baptist to hold a hearing and permit an appeal of an unfavorable determination before seeking a physician's removal. But Partin resigned, and the 2019 Bylaws expressly provide that "voluntary … relinquishment of Clinical Privileges … shall take effect without Hearing or Appeal."

To this, Partin responds that, because he was facing likely termination, his resignation was involuntary and under duress. Indiana courts, however, have held that an employer's threat to remove an employee does not constitute actionable duress. *See Guzik v. Town of St. John*, 875 N.E.2d 258, 268 (Ind. Ct. App. 2007); *Crabtree v. Lee*, 469 N.E.2d 476, 478 (Ind. Ct. App. 1984). Indeed, where an employee is given the choice between resignation or termination, "the opportunity to make such a choice is in the employee's best interest." *Crabtree*, 469 N.E.2d at 478; *see Guzik*, 875 N.E.2d at 269 (affirming summary judgment where employee resigned to avoid embarrassment and because he believed that his employer no longer wanted him to be the chief of police). Thus, summary judgment was properly granted as to Partin's breach of contract claim.

### C. Duty of Good Faith and Fair Dealing

Citing to the 2016 Bylaws and the 2019 Bylaws, Partin also claims that Baptist breached its common law duty of good faith and fair dealing. Indiana courts have only recognized an implied duty of good faith and fair dealing where there is a contract, and even then, only in limited circumstances. *ARC Welding Supply Co. v. Am. Welding & Gas, Inc.*, No. 3:16-cv-00173, 2017 WL 4012106, at *9 (S.D. Ind. Sept. 12, 2017).

As explained, the 2016 Bylaws, by their terms, did not create a contract between Partin and Baptist. Furthermore, assuming that the 2019 Bylaws did, this alone is not enough because "Indiana law does not impose a generalized duty of good faith and fair dealing on every contract[.]" *Gerdon Auto Sales, Inc. v. John Jones Chrysler Dodge Jeep Ram*, 98 N.E.3d 73, 82 (Ind. Ct. App. 2018) (internal quotation marks omitted). Instead, "implied covenants of good faith and fair dealing apply only to insurance and employment contracts or where contracts are ambiguous as to the application of the covenants or expressly impose them." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 918 (Ind. Ct. App. 2011).

The problem is Partin waited until his reply brief to argue that the 2019 Bylaws satisfy these limited conditions. It is true that he argued in his opening brief that the 2019 Bylaws constituted a contract between himself and Baptist, but it was only after Baptist noted that the bylaws did not imply a covenant of good faith and fair dealing in its response brief that Partin posited the opposite in his reply. Although these two contract-based theories may be related, they are two distinct claims alleged in separate counts. Thus it would be fair to

deem the argument waived. *See United States v. Diaz*, 533 F.3d 574, 577 (7th Cir. 2008).

But the argument also fails on the merits. The 2019 Bylaws do not expressly create a covenant of good faith and fair dealing, nor is there any ambiguity in how the provisions at issue were to be applied. Furthermore, even assuming such a duty could be implied and the bylaws provided Eichenberger with discretion in applying them, for the reasons we have discussed, Partin received all the process he was due under the terms of the 2019 Bylaws.

Thus, we find no error in the district court's grant of summary judgment to Baptist on this issue.

### D. Third-Party Beneficiary Claim

Baptist's contract with Floyd proscribed Baptist from requesting the immediate removal of a physician unless he violated Baptist's written policies, procedures, or bylaws. Partin asserts that he was a third-party beneficiary of this contract and, thus, could sue Baptist to enforce this provision. His theory, however, suffers from numerous deficiencies.

First, the Indiana Supreme Court has held that "a third party does not gain the right to sue under a contract merely because he may derive an incidental benefit from the performance of the promisor." *Harvey v. Lowry*, 183 N.E. 309, 311 (Ind. 1932) (internal quotation marks omitted). To that end, it has carefully circumscribed when a third-party can sue to enforce the terms of a contract between other parties—"[t]o be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party." *Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006) (internal quotation marks

omitted). Merely conferring a benefit on a third party is not enough; "[i]t must appear [from the contract] that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed." *Id.* Thus, "[t]he intent of the contracting parties to bestow rights upon a third party must affirmatively appear from the language of the instrument when properly interpreted and construed." *Id.* Nothing in Baptist's agreement with Floyd manifests this intent.

Under its contract with Floyd, Baptist agreed to compensate Floyd for supplying licensed medical personnel for the hospital's emergency department. And, as Partin points out, the agreement states that the compensation Baptist pays to Floyd must be sufficient to allow Floyd to pay its physicians reasonable and competitive salaries and benefits. What this provision lacks, however, is any language obligating Baptist to provide anything directly to the physicians themselves.

Partin also cites Baptist's promise to "provide other reasonable support services necessary for the proper conduct of the Emergency Department as requested by [Floyd] or the physicians and as agreed to by [Baptist]." But this provision likewise does not demonstrate an intent by Baptist to become directly obligated to the physicians. At most, it simply indicates that Baptist would consider requests made by Floyd or its physicians for support services.

As part of its contractual obligations, Floyd agreed to remove a physician immediately at Baptist's request under certain enumerated circumstances. From this, Partin posits the converse, arguing that a physician who did not fall within the listed categories (presumably referring to himself) cannot be

removed immediately. However dubious such a logical jump may be, it is not clear why Floyd's promise to remove a physician under certain conditions would impose any obligations on Baptist to act for the benefit of physicians.

Finally, as part of those enumerated conditions, Floyd agreed to immediately remove a physician if he failed to comply with the hospital's written policies and procedures "after being given notice of his failure to comply." Pointing to this clause, Partin argues that he must have been an intended third-party beneficiary because the agreement obligated Baptist to give him notice of any policy violations. The language, however, is ambiguous at best—was Baptist to give notice to the physician or to Floyd? Fortunately, a later provision clarifies what the parties intended. Section 22, entitled "Notice," requires Baptist to provide notice to the company, not the physician as Partin posits. For all of these reasons, summary judgment as to Partin's breach of contract claim based on a third-party beneficiary theory was appropriate.

### E. Tortious Interference with Contract

Among his many state law claims, Partin also alleges that Baptist and Eichenberger tortiously interfered with his employment contract with Floyd. To establish this claim under Indiana law, "a plaintiff must show: 1) existence of a valid and enforceable contract; 2) defendant's knowledge of the existence of the contract; 3) defendant's intentional inducement of breach of the contract; 4) the absence of justification; and 5) damages resulting from defendant's wrongful inducement of the breach." *Am. Consulting, Inc. v. Hannum Wagle & Cline Eng'g, Inc.*, 136 N.E.3d 208, 214 (Ind. 2019).

A plaintiff can establish the fourth element—absence of justification—in one of two ways. *Id.* at 215. He can show that "the defendant [acted] intentionally and without a legitimate business purpose and that 'the breach is malicious and exclusively directed to the injury and damage of another.'" *See id.* (quoting *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000)). Alternatively, a plaintiff can prove that the defendant acted unfairly and unreasonably under the circumstances. *See id.* Under the latter approach, courts consider, among other things, "the nature of the defendant's conduct" and "the defendant's motive," as outlined in the Restatement (Second) of Torts § 767. *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994); *Guinn v. Applied Composites Eng'g, Inc.*, 994 N.E.2d 1256, 1268–73 (Ind. Ct. App. 2013).[4]

Utilizing the second approach, Partin contends that Baptist exerted unfair economic pressure on Floyd to remove him when Eichenberger informed Floyd that Baptist "will have no choice but to issue [Floyd] a ninety-day written notice of termination of the Agreement, pursuant to Section 1.d." if Partin was not removed. The agreement, however, permits either party to cancel the agreement for any reason with ninety-day notice. Accordingly, Baptist's conduct cannot be considered unfair economic pressure under Indiana law, particularly

---

[4] Baptist and Eichenberger believe that Partin waived this argument by failing to raise it below. But this is incorrect. Partin cited to the applicable Restatement provisions in his summary judgment brief.

given the many complaints the hospital had received over the years regarding Partin's conduct.[5]

### F. Defamation *Per Se*

For his final state law claim, Partin asserts that certain statements by Eichenberger and Marksbury constituted defamation *per se* and that Baptist, as their employer, is liable for them. In support, Partin directs us to two separate communications: Eichenberger's letter to Floyd requesting Partin's removal, and Marksbury's email to McMinoway after Marksbury's investigation into the staff's complaints.

Under Indiana law, defamation *per se* "arises when the language of a statement, without reference to extrinsic evidence, constitutes an imputation of (1) criminal conduct, (2) a loathsome disease, (3) misconduct in a person's trade, profession, office, or occupation, or (4) sexual misconduct." *Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind. 2010). That said, an otherwise defamatory statement can be protected by the defense of qualified privilege, which applies to "communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a

---

[5] Partin also argues that Baptist acted unfairly by retaliating against him in violation of EMTALA. But, as we have explained, the EMTALA claim is meritless. This also dooms Partin's tortious interference with business relations claim, which requires some illegal action by the tortfeasor. *See Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286, 291 (Ind. 2003) (holding that such a claim must be based on an "independent illegal action").

corresponding interest or duty." *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992) (internal quotation marks omitted).

When invoking the qualified privilege, the defendant bears the burden "in the first instance to establish the existence of a privileged occasion for the publication, by proof of a recognized public or private interest which would justify the utterance of the words." *Id*. Once the defendant satisfies this burden, "the plaintiff then has the burden of overcoming that privilege by showing that it [was] abused." *Id*. This may be accomplished by showing that "(1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth." *Id.*

Of particular relevance here, "[t]o accommodate the important role of free and open intracompany communications and legitimate human resource management needs, the qualified privilege is available to protect personnel evaluation information communicated in good faith." *Id.* And, in this context, communications "between employers and employees, business partners, members of fraternal organizations, creditors and credit agencies" fall within the privilege. *Cortez v. Jo-Ann Stores, Inc.*, 827 N.E.2d 1223, 1233 (Ind. Ct. App. 2005).

Partin concedes, as he must, that the statements by Eichenberger and Marksbury are protected by qualified privilege because they involved employment matters. He nonetheless argues that the district court should not have granted summary judgment because neither believed nor had grounds to believe in the truth of their statements at the time.

In Partin's view, Eichenberger's letter contains two defamatory statements: that Partin's "disruptive behavior [which began in 2012] persists" and that Partin "continues to behave contrary to the [h]ospital's policies." But no reasonable jury could find on this record that these statements were made maliciously or in bad faith.

As to the first, Partin points out that no one had lodged a written complaint against him for the five-year period leading up to the incident with J.C. However, to overcome the privilege, Partin must do more than dispute the accuracy of Eichenberger's statement. He must offer facts to show that Eichenberger made the statement without believing it to be true or that he lacked any grounds for believing the statement to be true. *See Bals*, 600 N.E.2d at 1357.

Rather than supporting Partin's position, the undisputed record reveals numerous issues the hospital had with his behavior since 2012. For example, in 2013, Baptist placed Partin on a six-month review due to patient-related complaints. And two years later, the hospital required him to complete a disruptive behavior course based upon complaints about his behavior in the emergency department. Accordingly, there were ample grounds for Eichenberger's statement noting the persistence of Partin's behavior issues.

As to Eichenberger's statement that Partin "continues to behave contrary to the [h]ospital's policies," Partin cites Eichenberger's deposition testimony that he did not have a particular policy in mind when signing the letter. But Eichenberger was not the only person involved in preparing it. Baptist's legal counsel assisted in drafting the letter and reviewed it for accuracy. As a result, Eichenberger's deposition testimony

alone is insufficient to show that he had written the statement in bad faith.

Turning to Marksbury's email, Partin relies on three particular statements, but context is critical, and so the relevant passage is provided below (with the three statements in italics):

> I have been reflecting on our conversation from this morning. *I do believe that for staff and patient safety that we have reached the point that Dr. Eichenberger proposed.* Based on the information I have heard from previous situations with Dr. Partin, *I do not think I can convince the ED staff to continue supporting him.* I believe that risk, myself, and Dr. Eichenberger will continue to be pulled into situations due to the lack in confidence the ED staff has for his judgement.…

> Finally, the nurses involved in the situation on 9/3/19 are three of my highest performing nurses. *I stand by their conviction* to advocate for their patient and *that Dr. Partin's documentation did not reflect the truth*.

Beginning with Marksbury's second statement—"I do not think I can convince the ED staff to continue supporting him."—it expresses her belief as to what she may or may not be able to do in the future. As such, this statement is an opinion and cannot support a defamation claim. *See Sheets v. Birky*, 54 N.E.3d 1064, 1071 (Ind. Ct. App. 2016) (holding that a statement predicting that support "will be hard to come by" was not defamation *per se*); *Meyer v. Beta Tau House Corp.*, 31 N.E.3d 501, 515 (Ind. Ct. App. 2015) ("If the speaker is merely

expressing his subjective view, interpretation, or theory, then the statement is not actionable.").

As for Marksbury's other two statements, Partin returns to his argument that she made these statements without knowledge as to their truth. But there is no evidence to support this contention. Marksbury was tasked with investigating whether J.C. had consented to the intravenous fluids and rectal temperature measurement. As part of the investigation, she reviewed numerous reports by staff members documenting that J.C. was alert and capable of denying consent at the time.

For example, one nurse wrote: "There was never any evidence of psychosis; no delusions or any loss of touch with reality was noted." Another reported: "Patient was alert and oriented x4" and "maintained her alert and oriented status the entire time I took care of her until I transferred care to nightshift at 1900." And yet another recounted that Partin "demanded that [J.C.] be held down and medical care be forced upon her against her wishes despite … being alert, oriented, and appropriate."

Based on the undisputed facts, no rational jury could conclude that Marksbury did not believe in the truth of her statements or lacked any grounds to do so.[6] And because no reasonable jury could find that she or Eichenberger defamed Partin, his claim against Baptist on a *respondeat superior* theory

---

[6] Partin also contends that Marksbury was motivated by ill will when making her statements, but he has waived the issue by failing to raise it before the district court. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011).

also fails. *See Scott v. Retz*, 916 N.E.2d 252, 257 (Ind. Ct. App. 2009).

### III. Conclusion

For these reasons, the district court's entry of summary judgment in favor of the defendants is AFFIRMED.